**INDUSTRIAL GENERAL CORPORATION, Plaintiff, Appellee,**

v.

**SEQUOIA PACIFIC SYSTEMS CORPORATION, Defendant, Appellant.**

No. 94–1617.

United States Court of Appeals, First Circuit.

Heard Oct. 5, 1994.

Decided Jan. 11, 1995.

STAHL, Circuit Judge.

Industrial General Corporation's ("IGC") subsidiary, Plastek Corporation ("Plastek"), supplied molded plastic parts to Moog Electronics ("Moog") for use in electronic voting machines Moog was assembling for Sequoia Pacific Systems Corporation ("Sequoia"). After Moog failed to pay Plastek $80,100 for supplied parts, Plastek sued Sequoia alleging breach of contract and violation of Mass. Gen.L. ch. 93A, § 11. Following a seven-day trial, the jury returned a verdict for Sequoia on the breach of contract claim. In an advisory verdict on the 93A claim, it found that Sequoia had acted "unfairly." The district court eventually agreed with the advisory finding and further held that Sequoia had breached a fiduciary duty it owed to Plastek and entered judgment for Plastek on the 93A claim. Because we find that no fiduciary relationship existed between Plastek and Sequoia, we reverse the court's chapter 93A judgment.[1]

## I.

### FACTUAL BACKGROUND AND PRIOR PROCEEDINGS

In 1984, Sequoia began to design and develop computerized electronic voting machines which it hoped to sell to local election boards. During that same year, Sequoia Associates, a partnership and one of Sequoia's stockholders, had explored the possibility of acquiring IGC's predecessor-in-interest, Walco National, Inc. ("Walco"). Though the Sequoia Associates–Walco deal ultimately failed, because of the acquisition negotiations, Sequoia Associates had become familiar with Walco's Plastek division, which produced molded plastic parts. Recognizing that the voting machines would use plastic parts, Sequoia Associates advised Sequoia of Plastek's molding abilities. The introduction was fortuitous, as Sequoia was under time constraints to complete the project and had been unable to locate a suitable supplier for the needed plastic parts.

Stanley W. Wheatley with whom Gordon & Wise, Boston, MA, was on brief, for appellant.

Walter J. Connelly with whom Lyne, Woodworth & Evarts, Boston, MA, was on brief, for appellee.

Before CYR and STAHL, Circuit Judges, and DiCLERICO, District Judge.*

* Of the District of New Hampshire, sitting by designation.

---

1. The breach of contract claim is not at issue in this appeal.

Commencing in mid–1985, Sequoia and Plastek entered into a series of contracts providing that Plastek would develop prototype molds and, later, produce prototype parts for use in the voting machines project. Meanwhile, Sequoia and Moog entered into agreements for Moog to assemble a number of prototype voting machines. In connection with these agreements, Sequoia instructed Plastek to ship some prototype parts to Moog. Sequoia paid Plastek in full for the prototype molds and prototype parts and these transactions are not in dispute. Later, Plastek produced production molds, for which Sequoia also paid in full.

In the latter part of 1985, Sequoia decided to contract with a manufacturer to assemble the Sequoia-designed voting machines. Sequoia would then purchase the machines on a "turn-key" basis,[2] thus relieving it of both the burden of carrying the inventory of parts required for assembly and the burden of assembly itself. Sequoia awarded the initial manufacturing contract to Momentum Technologies, Inc. ("Momentum"). Moog sued Sequoia, claiming that one of their earlier prototype-assembly contracts contained a promise to award Moog a contract for an actual production run of at least 5,000 machines. In settlement, Sequoia agreed to award Moog a contract to manufacture 500 machines with Momentum manufacturing the balance of Sequoia's requirements.

Moog's finances during this period were shaky, though the extent of Sequoia's knowledge of Moog's condition was disputed at trial. The district court credited the testimony of Edmund Lonergan, Sequoia's former technical director, who at trial testified by deposition that he developed a "gut feeling" that Moog was not "financially strong enough to manufacture all the units per our [settlement] agreement with them." Lonergan alerted his superiors at Sequoia. James Larkin, Sequoia's chief financial officer, testified that he knew Moog had a cash-flow problem and that he agreed to a billing arrangement designed to improve Moog's cash situation.

Sequoia informed Plastek that the machines would be assembled by contractors and that Plastek's agreement for production parts were to be made directly with those assemblers. Complying with this directive, both Moog and Momentum contracted directly with Plastek and other suppliers for the voting machine parts.

In June and July 1986, Moog issued to Plastek purchase orders for production parts.[3] Plastek sent acknowledgement of the orders to Moog. Plastek manufactured the parts and shipped them to Moog on a net 30 day basis. Plastek invoiced Moog directly and the invoices stated, "Sold to Moog." The shipments were carried on Plastek's books as Moog account receivables. Plastek never conducted a credit check on Moog, nor did any Plastek official inquire of Sequoia about Moog's financial situation or creditworthiness.

After the Moog–Sequoia settlement was in place, things began to deteriorate at Moog. Moog quickly fell behind on its production schedule. Eventually, Sequoia determined that Moog would be unable to timely perform its contract and, in September 1986, requested Moog to transfer all work-in-progress to Momentum. Sequoia paid Moog in full for its work-in-progress, including the amount Moog owed Plastek for the production parts.

Moog, however, never paid Plastek. Plastek sought to collect its unpaid balance from Moog with no success. In November 1986, well after the work-in-progress transfer had taken place, Plastek alerted Sequoia of its problems with Moog. By early 1987, Moog was insolvent. In February 1987, Plastek notified Sequoia that it was holding Sequoia responsible for the unpaid Moog balance. Five months had passed since Plastek had shipped and invoiced its parts to Moog.

In 1989, Plastek, through its parent, IGC, brought the present action in Massachusetts Superior Court seeking recovery for breach of contract and for violation of Mass.Gen.L. ch. 93A, § 11. Sequoia removed the case to

---

**2.** Under a turn-key arrangement, an assembler contracts to produce a product for a buyer that is ready to operate at the "turn of a key."

**3.** About this time, Momentum also issued purchase orders to Plastek. Plastek shipped the parts to Momentum and Momentum paid the invoices for them in full.

federal district court with jurisdiction grounded in diversity of citizenship. After discovery, the district court denied Sequoia's motion for summary judgment. The district court held a seven-day jury trial in February 1994. The district court instructed the jury to answer questions on a special verdict.

The jury returned a verdict in Sequoia's favor on the breach of contract claim. With regard to the chapter 93A claim, the jury found that Sequoia acted "unfairly" in "failing to disclose what it knew about Moog's financial stability." However, the jury did not find that Sequoia's acts were deceptive or that its actions were knowing and willful. The district court, essentially agreeing with the jury, found that Plastek was in a position of "trust and dependence" relative to Sequoia and that Sequoia had acted "unfairly in failing to disclose the fact that Moog was an unreliable customer." *Industrial Gen. Corp. v. Sequoia Pac. Sys. Corp.*, 849 F.Supp. 820, 824 (D.Mass.1994). The district court entered judgment in favor of IGC for $80,-100.69 plus costs. This appeal followed.

## II.

### DISCUSSION

Sequoia argues that the district court committed clear error in three respects: by finding (1) that Sequoia and Plastek had a fiduciary or quasi-fiduciary relationship; (2) that Sequoia possessed knowledge of material facts that it did not disclose to Plastek; and (3) that Sequoia's failure to disclose material facts regarding Moog's financial condition was causally related to Plastek's damages. After reciting the standard of review, we take up Sequoia's first argument. Because we conclude that no fiduciary relationship existed between these parties, we do not reach the other claims of error raised by Sequoia.

### A. Standard of Review

■ On review, questions of law are determined *de novo*. *See, e.g., American Title Ins. v. East W. Fin. Corp.*, 16 F.3d 449, 453–54 (1st Cir.1994). Findings of fact "shall not be set aside unless clearly erroneous." Fed. R.Civ.P. 52(a). A finding of fact is " 'clearly

erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (citation omitted); *see also Tresca Bros. Sand & Gravel, Inc. v. Truck Drivers Union, Local 170*, 19 F.3d 63, 65 (1st Cir.1994) ("the central finding ... 'will be given effect unless, after reading the record with care and making due allowance for the trier's superior ability to gauge credibility, [we form] a strong, unyielding belief that a mistake has been made' ") (quoting *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 972 F.2d 453, 457 (1st Cir.1992) (other citation omitted)).

### B. Chapter 93A and Massachusetts Common Law Governing Fiduciary Relationships

Section 11 of the Massachusetts unfair trade practices statute, Mass.Gen.L. ch. 93A, grants a cause of action to persons engaged in commerce who suffer a loss because of the unfair acts or practices of another person engaged in commerce. Though the statute does not define the term "unfair," courts applying section 11 have developed a standard under which the " 'objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce.' " *Quaker State Oil Ref. Corp. v. Garrity Oil Co.*, 884 F.2d 1510, 1513 (1st Cir.1989) (quoting *Levings v. Forbes & Wallace, Inc.*, 8 Mass.App.Ct. 498, 396 N.E.2d 149, 153 (1979)). Further, a chapter 93A claimant must establish that "the defendant's actions fell 'within at least the penumbra of some common-law, statutory, or other established concept of unfairness,' or were 'immoral, unethical, oppressive or unscrupulous,' and resulted in 'substantial injury ... to competitors or other businessmen.' " *Quaker State*, 884 F.2d at 1513 (quoting *PMP Assocs., Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 321 N.E.2d 915, 917 (1975)).

■ " 'Although whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact, the boundaries

**44**

of what may qualify for consideration as a chapter 93A violation is a question of law.'" *Shepard's Pharmacy, Inc. v. Stop & Shop Cos.*, 37 Mass.App.Ct. 516, 640 N.E.2d 1112, 1115 (1994) (citation omitted). Here, the unfair conduct complained of is Sequoia's failure to disclose Moog's precarious financial condition. A commentator has noted that section 11 "probably does not contain a general duty of disclosure" and where the statute does give rise to such a duty, it "should be limited to situations which even at common law sometimes required disclosure," including instances where the defendant is a fiduciary. Michael C. Gilleran, *The Law of Chapter 93A* § 4:10 (1989 & Supp.1994). The theory presented to the jury and later adopted by the district court was that Sequoia stood in fiduciary relationship to Plastek and, consequently, a duty to disclose arose. We agree with the district court that if a fiduciary relationship existed, its breach would have constituted a chapter 93A violation.

As noted above, the district court found that Plastek was in a position of "trust and dependence" with respect to Sequoia and that it subsequently abused this relationship when it failed to disclose what it knew of Moog's financial difficulties. The crux of the present dispute, therefore, is whether the Sequoia–Plastek relationship was fiduciary in nature.

■ The question of whether, in a particular factual setting, a fiduciary relationship exists is a question of fact. *See, e.g., Broomfield v. Kosow*, 349 Mass. 749, 212 N.E.2d 556, 560 (1965). Our review of factual assessments made by Massachusetts courts suggests that a fiduciary relationship will frequently be found where certain indicia are present. First, a party owed a fiduciary duty is often in a position of great disparity or inequality relative to the other party. *See, e.g., Kosow* 212 N.E.2d at 560. Second, a fiduciary duty (and breach thereof) will be found to exist where the disparity in relationship has been abused to the benefit of the more powerful party, particularly where unjust enrichment would result. *See, e.g., id.; Warsofsky v. Sherman*, 326 Mass. 290, 93 N.E.2d 612, 615 (1950).

Further, in the commercial context, other indicia of fiduciary relationships are generally present. Massachusetts courts have stated that, though business transactions conducted at arm's length generally do not give rise to fiduciary relationships, such a relationship can develop where one party reposes its confidence in another. *See, e.g., Warsofsky*, 93 N.E.2d at 615. Importantly, however, courts have repeatedly cautioned that "'the plaintiff alone, by reposing trust and confidence in the defendant, cannot thereby transform a business relationship into one which is fiduciary in nature.'" *Superior Glass Co. v. First Bristol County Nat'l Bank*, 380 Mass. 829, 406 N.E.2d 672, 674 (1980) (quoting *Kosow*, 212 N.E.2d at 560). In determining whether such a transformation has taken place, courts look to the defendant's knowledge of the plaintiff's reliance and consider the relation of the parties, the plaintiff's business capacity contrasted with that of the defendant, and the "readiness of the plaintiff to follow the defendant's guidance in complicated transactions wherein the defendant has specialized knowledge." *Kosow*, 212 N.E.2d at 560.

*C. The Relationship Between Sequoia and Plastek*

■ After a careful review of the whole record, and in light of the foregoing discussion of Massachusetts cases, we cannot agree that the facts in this case establish that Sequoia occupied a fiduciary position with regard to Plastek. We think that the district court's conclusion to the contrary rises to the level of clear error.

In finding that a fiduciary relationship existed, the district court placed heavy reliance on its conclusion that Sequoia "managed" the entire transaction, a conclusion based upon the following facts: (1) that Sequoia designated Moog as the general contractor; (2) that Sequoia "generated the purchasing orders and effectively authored the contract between Plastek and Moog"; and (3) that Sequoia continued its relationship with Moog "for no purpose other than to extricate itself from a legal imbroglio of its own making." *Industrial Gen. Corp.*, 849 F.Supp. at 825.

We think the district court's conclusion is mistaken for two basic reasons. First, it rests on a subsidiary factual finding that we believe is clearly in error. Upon careful review of the record, we think the court's assertion that "Sequoia generated the purchasing orders and effectively authored the contract between Plastek and Moog," *id.*, substantially misstates what transpired. To be sure, Sequoia officials directed Plastek to deal directly with Moog. However, as both Sequoia and Plastek officials testified, Moog issued purchase orders for the production parts and Plastek acknowledged those orders.[4] Notably, there is no evidence that Sequoia directed or was in any other way involved with Plastek's fateful decision to ship the production parts to Moog on a net 30 day basis. Second, and more importantly, we do not think that Sequoia's overall "management" role is sufficient to transform the parties' relationship into a fiduciary one. We note that the transaction involved here is not uncommon in the commercial world. Under a turn-key arrangement, a manufacturer agrees to deliver to a buyer a completely assembled product that is ready to function. It is the manufacturer's responsibility to acquire needed parts, even if acting at the direction of the turn-key buyer. Accordingly, as we have just noted, the two voting machine manufacturers, Moog and Momentum, issued purchase orders to Plastek. Plastek, in turn, sent acknowledgments. Plastek shipped those orders, pursuant to its own credit policies, on a net 30 day basis. Critically, Plastek did not conduct a credit check before shipping the parts to Moog nor did it take any other steps to protect itself against nonpayment.

While the Sequoia–Moog settlement did serve to extricate Sequoia from an untimely legal battle, that agreement could not and did not advance Sequoia's interests at the expense of Plastek. Sequoia remained liable to Moog for the costs of the production parts and, when the work-in-progress was transferred from Moog to Momentum, Sequoia paid Moog in full for the parts Moog had acquired from Plastek.

Our conclusion that Sequoia's "management" role is an insufficient basis to transform this relationship into a fiduciary one is reinforced by reference to the indicia outlined above. First, we find no great disparity in the Sequoia–Plastek relationship. The record indicates that both Sequoia and Plastek were experienced in the commercial world. Further, the facts suggest that, because Sequoia was operating under a tight deadline and had encountered difficulties in locating an adequate plastic parts supplier, Plastek was not altogether without leverage in the relationship. Second, to the extent a disparity existed in Sequoia's favor, we again fail to see how the relationship was abused to the benefit of Sequoia. The effect of the judgment below will not be to remedy unjust enrichment or, for that matter, any other benefit accruing to Sequoia. Sequoia would simply be paying again for the same parts it had already purchased from Moog. Third, the district court did not find that Sequoia had knowledge of Plastek's alleged reliance on the trust and dependence it had reposed in Sequoia. Our own review of the record reveals nothing that would have alerted Sequoia to a heightened fiduciary status or that Plastek was relying on Sequoia to guarantee payment. With specific regard to the Moog sales, at no point did Plastek officials make inquiry of Sequoia regarding Moog's finances or creditworthiness, and Plastek waited months before alerting Sequoia of its problems with Moog. Even if we were to agree with the district court that Plastek, having been "lulled by Sequoia's blandishments and visions of lucre, looked to Sequoia to watch out for its interests," *Industrial Gen. Corp.*, 849 F.Supp. at 823, the record is devoid of any evidence that Sequoia knew of this reliance. In short, the facts overwhelmingly suggest that to the extent Plastek reposed "trust and dependence" in Sequoia, it did so unilaterally.

Finally, we observe that our conclusion comports with the so-called "rascality" standard underlying section 11 unfairness claims. We agree with the district court's conclusion

---

4. Sequoia did issue purchase orders for *prototype* parts (for which it subsequently paid) but, as noted above, these orders are not at issue here.

that Plastek was "naive, inattentive and altogether too trusting of Sequoia," *Industrial Gen. Corp.*, 849 F.Supp. at 825–26, and that its complacency may have been due, in part, to the fact that Plastek and Sequoia "were not strangers to one another" given the initial exploration by one of Sequoia's principals into acquiring Walco (the predecessor-in-interest of Plastek's parent company). By extending credit to Moog and assuming—perhaps through naivete, inattention and trust—that Sequoia would pick up the tab, Plastek clearly made a costly mistake. Though Sequoia might have chosen to share with Plastek its concerns about Moog's finances as they developed, we do not think that its failure to do so would make Sequoia a commercial rascal.

 Under the clearly erroneous standard, we are not free to reverse merely because we disagree with the district court's conclusions. Rather, we must have the strong, unyielding conviction that the district court was mistaken. This standard is especially important in a case like this where the district court made a factual determination based on evidence adduced during a lengthy and exhaustive trial. We emphasize that we have thoroughly and carefully examined the record. Based on the record as a whole, and in light of similar factual evaluations made by Massachusetts courts, we are of the unyielding belief that the district court's conclusion that a fiduciary relationship existed between Sequoia and Plastek was mistaken. Because there was no fiduciary relationship, no duty to disclose existed and thus no cause of action lies under section 11, chapter 93A.

### III.

### CONCLUSION

For the foregoing reasons, the decision of the district court is reversed and the case is remanded for proceedings consistent with this opinion.

***Each party shall bear its own costs.***