USCA1 Opinion

 

 United States Court of Appeals For the First Circuit ____________________ No. 96-1802 JAMES L. MINITER INSURANCE AGENCY, INC., Plaintiff, Appellant, v. OHIO INDEMNITY COMPANY, Defendant, Appellee. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Richard G. Stearns, U.S. District Judge] ___________________ ____________________ Before Selya, Circuit Judge, _____________ Cyr, Senior Circuit Judge, ____________________ and Stahl, Circuit Judge. _____________ ____________________ Peter C. Knight with whom Hunter O'Hanian, Tory A. Weigand, ________________ _______________ _________________ Morrison, Mahoney & Miller were on brief for appellant. __________________________ David P. Shouvlin with whom Porter, Wright, Morris & Arthur, __________________ __________________________________ Michael R. Gottfried and Burns & Levinson, LLP were on brief for _____________________ _______________________ appellee. ____________________ May 12, 1997 ____________________ STAHL, Circuit Judge. Plaintiff-appellant James L. STAHL, Circuit Judge. _____________ Miniter Insurance Agency, Inc. ("Miniter") appeals the district court's grant of summary judgment in favor of defendant-appellee Ohio Indemnity Company ("Ohio") on Miniter's six-count complaint for damages arising out of a dispute over right to commissions.1 Finding no error, we affirm. Background Background __________ Miniter, an insurance brokerage located in Quincy, Massachusetts, serves over four hundred and fifty insureds, three hundred of which are banks and other financial institutions. Banks and financial institutions need, among others, a type of insurance known as Vender's Single Interest Insurance ("VSI"), which insures lenders against potential losses arising from the differential between the actual value of a vehicle being financed and the lender's security interest. VSI is offered by Ohio, an insurance company located in Columbus.  In 1984, Miniter became broker for Connecticut National Bank ("CNB") and procured a VSI policy for CNB through Fidelity and Deposit Insurance Company ("Fidelity"). In 1988, CNB merged with Shawmut Bank ("Shawmut"), which  ____________________ 1. As amended, Miniter's complaint alleged breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, unjust enrichment, interference with advantageous relations, and violation of Mass. Gen. Laws ch. 93A, 2, 9, and 11. -2- 2 continued to meet its insurance needs through Miniter. That same year, Fidelity stopped issuing VSI policies in Massachusetts, and Miniter moved Shawmut's VSI coverage to Travelers Insurance Company ("Travelers"). Eventually, Travelers also discontinued its VSI business, which led Miniter to solicit a VSI proposal from Ohio. In 1990, Ohio agreed to provide VSI to Shawmut, and Miniter and Ohio entered into an agency agreement to effectuate the arrangement. Miniter characterizes the agreement as a non- exclusive agency agreement under which Miniter had no obligation to issue insurance exclusively through Ohio; Ohio had no obligation to accept only policies brokered by Miniter. The agency agreement contained several provisions relevant to this dispute. First, it provided that Miniter would receive commissions of 20% of the premiums paid on policies issued by Ohio to "policyholders obtained" by Miniter. Second, it provided that should a conflict arise as to which agent was entitled to commissions on a particular policy, "the policyholder's written statement designating his agent or broker shall be binding" upon Miniter and Ohio. Third, the agreement provided that Miniter's right to commissions would cease upon proper cancellation of the policy. Finally, Ohio orally agreed not to contact or deal directly with Shawmut without involving Miniter. -3- 3 In September 1990, Ohio issued the first of two VSI policies to Shawmut. The first policy provided "run-off" coverage, meaning that should either Shawmut or Ohio cancel the policy, Ohio would be obligated to continue coverage for any vehicle insured during the life of the policy. In order to provide run-off coverage, Ohio needed to hold a portion of each premium in reserve for potential future claims. According to Ohio, the run-off coverage rendered its policy to Shawmut unprofitable. Miniter, however, viewed run-off coverage as an essential element of any VSI policy for Shawmut. In the spring of 1993 David Juredine, Miniter's contact at Ohio, began to indicate to Arthur Donley, Chairman of the Board and Chief Executive Officer of Miniter, that Ohio wished to cease providing run-off coverage to Shawmut. In the spring of 1994, Juredine indicated to Donley that Ohio would make a one time, lump sum payment to Shawmut of its run-off reserve if Shawmut would relieve Ohio of run-off liability. During the same period, Gary Grondin, Vice- President of Shawmut who handled VSI, began conveying to Miniter Shawmut's desire to reduce the amount Shawmut paid in premiums on its VSI policy. At some point Grondin asked Donley to solicit proposals from other carriers. On May 19, 1994 Juredine informed Miniter that Ohio could offer a lump sum payment of approximately $2,000,000 to -4- 4 Shawmut. Miniter immediately communicated this offer to Shawmut. On May 20, however, Ohio faxed Miniter the following: Dear Art: Please disregard previous and current correspondence (UPS overnight already mailed). The amount of unearned premiums mentioned is inaccurate. The new figure is being calculated. On May 26, Ohio faxed Miniter a new lump sum offer of $1.8 million, contingent on Shawmut's agreement to eliminate the run-off coverage. Miniter communicated the reduced offer as well. From late May into July 1994, Grondin and Donley continued to discuss whether Shawmut would receive the lump sum payment. The discussions came to a head in mid-July at a meeting between Grondin, Grondin's supervisor, Donley, and Donley's daughter Julianne, who serves as president of Miniter. Grondin came to the meeting expecting a check from Ohio, payable to Shawmut, in the amount of $1.8 million. Instead, Donley informed him that Ohio had reneged on its offer, that Ohio had no interest in making a deal, and that he wanted to move Shawmut to a different carrier. Grondin asked Donley for something in writing to this effect, in response to which Donley produced a letter from Ohio. Grondin testified that "[a]fter [he] read the letter . . . [he] stated to Arthur Donley that this does not state that David Juredine from [Ohio] didn't want to drop the run-off -5- 5 coverage and give us the $1.8 million."2 Grondin then refused to consider proposals Miniter had solicited from other carriers, and cancelled a subsequent meeting with Donley. At that point, Shawmut began to lose patience with Miniter, and felt deceived and "taken for a ride." Shortly after the meeting, Grondin informed Donley that he wanted to speak directly with someone at Ohio. Donley responded that Ohio did not want to speak with Shawmut and reiterated his desire to change insurance carriers. Grondin replied that he did not want to change carriers; he simply wanted the $1.8 million. On his own, Grondin began to solicit proposals from other carriers. Grondin also called Juredine at Ohio.  In his conversation with Juredine, Grondin indicated that he viewed Ohio's offer and subsequent retraction as very unethical. Grondin also informed Juredine that Shawmut sought to broker a new policy directly with a carrier rather than work through Miniter or any agent and that Shawmut intended to change carriers. Grondin indicated, however, that if Juredine wished to submit a proposal, Grondin would consider it. Juredine responded that he had "no problem" giving Shawmut the 1.8 million dollars. In the same conversation Juredine also informed Grondin that Ohio  ____________________ 2. Grondin testified that he did not have a copy of the letter Donley showed him, and the letter is absent from the record. -6- 6 had no problem letting Shawmut have a portion of the commissions, but that Donley did not want to reduce Miniter's commission level. Juredine then called Donley and apprised him that Grondin had contacted him and that Shawmut wanted to work through its own in-house agency, that is, Shawmut wanted some or all of the commissions deriving from the VSI policy. Donley asked Juredine what he planned to do and Juredine responded that he had to save the business for Ohio before he could worry about Miniter. Donley gave no indication to Juredine whether Shawmut had terminated Miniter. He simply reminded Juredine that he was not to negotiate with Shawmut directly without Miniter's involvement. From that point forward Shawmut began to negotiate VSI coverage directly with Ohio. On July 28, 1994 Ohio and Shawmut came to an agreement on the second VSI policy. The terms of the second policy designated the Shawmut Insurance Agency as the broker and required Ohio to pay commissions of 30%. The new policy did not include run-off coverage. It did include a lump sum payment to Shawmut of just over $2 million, representing the $1.8 million plus additional reserves earned during the summer of 1994. Also on July 28, Grondin and his supervisor informed Donley by telephone that Shawmut was terminating its relationship with Miniter, and Grondin followed up with a letter. -7- 7 Standard of Review Standard of Review __________________ We review the award of summary judgment de novo. _______ See Ortiz-Pinero v. Rivera-Arroyo, 84 F.3d 7, 11 (1st Cir. ___ ____________ _____________ 1996). Summary judgment is appropriate in the absence of a genuine issue of material fact, when the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. ___ 56(c). A fact is material when it has the potential to affect the outcome of the suit. See J. Geils Band Employee ___ ______________________ Benefit Plan v. Smith Barney Shearson, Inc., 76 F.3d 1245, ____________ ____________________________ 1250-51 (1st Cir.), cert. denied, 117 S. Ct. 81 (1996). _____ ______ Neither party may rely on conclusory allegations or unsubstantiated denials, but must identify specific facts derived from the pleadings, depositions, answers to interrogatories, admissions and affidavits to demonstrate either the existence or absence of an issue of fact. See ___ Fed. R. Civ. P. 56(c) & (e).  Choice of Law Choice of Law _____________ Miniter initially filed this action in Massachusetts state court and alleged only state claims. Ohio removed the case to federal district court in Massachusetts. See 28 U.S.C. 1332. The parties agree ___ that, pursuant to a choice of law provision in the agency agreement, Ohio law governs Miniter's contract based claims, and that Massachusetts law governs Miniter's tort claims. The parties dispute only which state's law governs the claim -8- 8 for breach of the implied covenant of good faith and fair dealing, ostensibly because of Ohio's contention that the common law of the state of Ohio does not recognize such a cause of action in these circumstances. We have held that "[w]here . . . the parties have agreed about what law governs, a federal court sitting in diversity is free, if it chooses, to forego an independent analysis and accept the parties' agreement." Borden v. Paul ______ ____ Revere Life Ins. Co., 935 F.2d 370, 375 (1st Cir. 1991). In ____________________ the absence of any compelling reason to do otherwise, we will honor the parties' choice of law on all counts upon which they agree. As we explain below, we need not decide which state's law governs Miniter's claim for breach of the implied covenant of good faith and fair dealing. Discussion Discussion __________ As indicated, the district court granted summary judgment against Miniter on all counts. On appeal Miniter claims that the district court improperly resolved genuine issues of material fact in order to arrive at its conclusions. We review Miniter's claims in turn, and, finding no error, we affirm. A. Breach of Contract ______________________ Miniter advances two arguments within its breach of contract claim. First, it asserts, Ohio breached the written agreement by failing to pay Miniter commissions for the -9- 9 second policy issued to Shawmut. Second, Miniter contends, Ohio breached "its subsidiary but separate promise" not to contact or deal directly with Shawmut without involving Miniter.  1. The Agency Agreement ________________________ The relevant provisions of the agency agreement provide: The Agent shall be entitled to commissions equal to 20% of the written premiums paid on policies issued by the Company to policyholders obtained by the Agent. If a conflict exists as to which producer is authorized to represent a policyholder, the policyholder's written statement designating his agent or broker shall be binding upon the Agent and the Company.  .... The Agent's right to commissions shall cease upon cancellation of a policy in accordance with the cancellation provisions in the policy. The district court found the relevant terms of the agency agreement unambiguous, and held that as a matter of law Shawmut's designation of its in-house agency as broker of record disposed of Miniter's claim to commissions on the second policy. On appeal Miniter asserts that the language in the agreement allows for more than one interpretation, and therefore, should have precluded summary judgment. Specifically, Miniter asserts that an issue of fact exists -10- 10 whether it "obtained" Shawmut for purposes of the agency agreement. Miniter also contends that the term "producer" does not apply in this situation between an agent and the insured client. Instead, Miniter contends, the term should only apply in situations involving two competing insurance agents. Finally, Miniter avers that it produced the second policy. We disagree. Neither the parties' nor our own examination of Ohio law has uncovered any cases construing the disputed terms of the agency agreement. We turn, therefore, to general principles of contract construction. In Ohio, construction of written contracts is a matter of law, with the underlying purpose of discovering and effectuating the intent of the parties. See Graham v. Drydock Coal Co., 667 ___ ______ _________________ N.E.2d 949, 952 (Ohio 1996). We must give common words appearing in written contracts "their plain and ordinary meaning unless manifest absurdity results or unless some other meaning is clearly intended from the face or overall contents" of the contract. Alexander v. Buckeye Pipeline _________ ________________ Co., 374 N.E.2d 146, 150 (Ohio 1978). We may consider ___ extrinsic evidence to ascertain the parties' intent either when faced with unclear or ambiguous language, or when circumstances surrounding the agreement give the plain language special meaning. See Graham, 667 N.E.2d at 952. ___ ______ "[W]here the terms in an existing contract are clear and -11- 11 unambiguous," however, we "cannot in effect create a new contract by finding an intent not expressed in the clear language employed by the parties." Alexander, 374 N.E.2d at _________ 150. We agree with the district court that the language of the agency agreement is clear and unambiguous, and provides without caveat that the policyholder's written statement designating its agent binds Miniter and Ohio. The agency agreement provides that the agent's right to commissions shall cease upon cancellation of a policy. The parties do not dispute that Shawmut cancelled the first policy, terminating Miniter's right to commissions. The agency agreement further provides that the policyholder's designation of its agent or broker shall be binding on Miniter and Ohio. Shawmut's written statement designating its in-house agency as its agent, therefore, controls disbursement of commissions under the second policy. Miniter's contention that it "obtained" Shawmut for purposes of the second policy fails to find support either in the agreement or the record. Miniter asserts that by introducing Shawmut to Ohio and brokering the first policy, Miniter obtained Shawmut for the second policy. On that basis, Miniter contends, the agency agreement requires Ohio to remit commissions to Miniter, and not Shawmut. The most obvious flaw in this argument is that it ignores the sentence -12- 12 immediately following the "obtained" sentence, which, as we have pointed out, provides that in the event of a conflict, the policyholder's written statement designating its agent shall bind Miniter and Ohio. The record further belies Miniter's assertion. Shawmut cancelled the first policy, initiated discussions with Ohio as well as other carriers, and ultimately made a deal with Ohio. Shawmut's decision to work in-house rather than through an independent agency fatally undermines Miniter's contention that it obtained Shawmut for Ohio for purposes of the second policy. Further, as we discuss in greater detail below, Miniter tried to steer Shawmut away from Ohio toward another carrier rather than maintain Shawmut as a policyholder of Ohio. Miniter ominously argues that to interpret the agency agreement in this fashion "would eviscerate the independent agency practice and arm insurers with a lethal weapon for eliminating and compromising the intermediary agent after the account has been brought to it." Miniter's interpretation would effectively allow Miniter to collect premiums on any policies Ohio issued to Shawmut, whether or not it actually brokered them, simply because it brokered the initial VSI policy between those parties. Miniter's interpretation would preclude Ohio from honoring Shawmut's designation in any insurance policies Ohio issued to Shawmut. In other words, that interpretation would -13- 13 contradict subsequent provisions in the same section of the agreement. We reiterate that "where the terms in an existing contract are clear and unambiguous, [we] cannot in effect create a new contract by finding an intent not expressed in the clear language." Alexander, 374 N.E.2d at 150. _________ Miniter argues that "the producer provision applies when there are two competing insurance agents, not between an agent and the insured." Miniter points to no language in the agreement limiting that provision beyond its plain terms. Ohio law dictates that we must presume that the written contract reflects the intent of the parties, see Graham, 667 ___ ______ N.E.2d at 952, and that we may consider extrinsic evidence only when that language is ambiguous or when circumstances surrounding the agreement give the plain language special meaning. See id. Miniter points us to no authority ___ ___ indicating that an insured may not procure insurance directly from a carrier, and in effect, act as its own agent or broker. We do not identify any special circumstances surrounding this agreement which might give the plain language special meaning. We note that by the terms of the agreement, the producer provision only takes effect when a conflict exists regarding which producer represents a policyholder. Shawmut informed Ohio that it would no longer be working through Miniter and that it was seeking proposals for a new policy. -14- 14 Shawmut cancelled the first policy. While Miniter now attempts to generate a conflict, or argue that the provision does not govern this situation, nothing in the record triggers the producer provision inasmuch as Shawmut on its own affirmatively undertook to negotiate the second policy. Equally unavailing is Miniter's argument that it, and not Shawmut's in-house agency, produced the second policy. Accepting Miniter's definition of "produced,"3 the record does not support its contention that, at a minimum, a dispute of fact exists as to whether it or Shawmut produced the second policy. Instead, as the record demonstrates, Miniter repeatedly urged Shawmut to move its business to another carrier rather than come to an agreement with Ohio, and effectively forced Shawmut to produce the policy by itself.  Grondin's undisputed testimony reflects Miniter's indication that Ohio was no longer interested in making a deal with Shawmut involving the lump sum payment. Miniter made this assertion despite the fact that Ohio remained willing to remit $1.8 million to Shawmut. In addition, Miniter tried to present Shawmut with proposals from other companies and urged Shawmut to let Miniter move the account to a different carrier. It was not until Shawmut decided to  ____________________ 3. According to Miniter, "[t]he common sense meaning of produce or 'producer' is one who 'brings forth,' 'brings forward,' 'generates,' or 'causes,' or 'to effect.'" -15- 15 work directly with a carrier and contacted Ohio that the second policy began to take shape. On the undisputed facts in this record, Miniter cannot lay claim to commissions on the second policy by claiming that it, and not Shawmut, produced the policy. 2. The No-Contact Agreement ____________________________ For purposes of summary judgment, Ohio does not dispute that in addition to the written agency agreement, Miniter and Ohio orally agreed that Ohio would neither communicate nor deal directly with Shawmut without including Miniter. The district court found that Ohio did not breach the no-contact agreement on the basis that Shawmut decided to terminate Miniter prior to initiating direct contact with Ohio and then informed Ohio of that fact. Miniter makes three principal arguments on appeal: (1) compliance with the agreement did not hinge on which party initiated the contact; (2) Ohio's wrongful conduct precipitated Shawmut's contact and Ohio's misrepresentations then compounded the situation; and (3) whether and when Shawmut intended to terminate Miniter presents a dispute of fact that precludes summary judgment on this claim. Miniter attempts to buttress these arguments with evidence of an industry custom which it alleges Ohio violated. We find none of Miniter's arguments persuasive and conclude that on this record no reasonable jury could find that Ohio breached the no-contact agreement. -16- 16 We understand Miniter's first argument essentially to contend that even if Shawmut initiated the direct contact, the agreement bound Ohio to include Miniter on the substantive discussions as long as Miniter remained Shawmut's broker of record. Even if the fact that Shawmut initiated the contact does not relieve Ohio of its obligations under the no-contact agreement, the undisputed substance of Shawmut's initial contact does. After the July meeting which failed to net Shawmut a $1.8 million payment, Grondin informed Donley that he wished to contact Ohio. He then called Juredine at Ohio, as well as at least one other insurance company, to solicit proposals. Grondin told Juredine of his disappointment that Ohio had reneged on the $1.8 million lump sum payment, that he was planning to change carriers, that Shawmut was no longer going to use Miniter, that Shawmut desired to work directly with a carrier rather than through an agent, and that if Juredine wished he could submit a proposal. Juredine then apprised Miniter of the situation. Only then did Grondin and Juredine engage in substantive discussions on a second VSI policy. In other words, only after Shawmut told Ohio that Miniter was out of the picture, that Ohio was next on the chopping block, and Ohio informed Miniter of the situation did Juredine and Grondin engage in substantive negotiations. -17- 17 The record does not support Miniter's contention that misconduct by Ohio precipitated Shawmut's contact with Ohio. Miniter takes the position that Ohio, in retracting the initial offer of $2 million, injured Miniter's credibility with Shawmut, its client. The record, however, does not support Miniter's claim. Ohio erred in its calculation of $2 million and immediately informed Miniter of that error. Six days later, Ohio submitted a recalculated figure of $1.8 million. Contrary to Donley's claims to Grondin and Grondin's supervisor, Ohio never indicated that it no longer wished to negotiate a lump sum deal. Grondin's disgruntlement came not from the reduction of the figure to $1.8 million, but from his understanding from Donley that Ohio had backed out altogether. In his deposition Grondin repeatedly testified that Shawmut expected $1.8 million from Ohio. The record similarly does not support Miniter's claim that Ohio's misrepresentations following Shawmut's initial contact in any way compounded the situation. Miniter contends that Ohio cast Miniter in a poor light by averring that it never had a problem with the lump sum payment. As the record reflects, however, Ohio simply told the truth. Ohio's concern had been primarily with the amount, which it reduced from $2 million to $1.8 million, as well as with some of the details of the revised VSI coverage. Despite -18- 18 Miniter's characterizations, Ohio remained willing to provide, and ultimately did provide Shawmut with a lump sum payment. Miniter also asserts that Ohio falsely informed Shawmut that "any impediment to any deal was Miniter's commission expense." This mischaracterizes the record. Grondin testified that in their first conversation, and after he informed Juredine that Shawmut desired to work directly with a carrier, Juredine responded that he had neither a problem with paying a $1.8 million lump sum nor with giving Shawmut a part of the commissions or a fee, but that Donley did not want to reduce his commission percentage. Nothing in the record supports Miniter's highly exaggerated characterization of Juredine's remark. In addition, Juredine did not make that remark until after Grondin informed him that Shawmut would no longer be working through Miniter. Miniter asserts that an issue of fact as to when Shawmut actually terminated Miniter should have precluded summary judgment on its breach of the no contact agreement claim. The district court found that Ohio did not breach the no contact agreement in part because it determined that by the time Shawmut contacted Ohio, Shawmut had already decided to terminate Miniter. Miniter correctly asserts that Shawmut did not formally terminate its brokerage designation until after Shawmut had negotiated the second policy with Ohio. -19- 19 Until that time the record supports a conclusion that Shawmut remained willing to consider any proposal Miniter might have made along with any other proposals Shawmut received. Grondin would have treated a proposal from Miniter like any other he received. We conclude that to the extent an issue of fact exists as to when Shawmut decided to terminate Miniter, it is not material to this dispute. See J. Geils Band, 76 F.3d at ___ _____________ 1250-51 (explaining that a material fact is one that has the potential to affect the outcome of the dispute). What is material is what Grondin conveyed to Juredine in the first call, namely, that Shawmut would no longer be working through Miniter or any independent agent, that Shawmut intended to change carriers, and that Ohio could submit a proposal if it wished.  Finally, Miniter points to the affidavit of its expert, Frederick J. England, Jr., to establish the insurance industry custom that insurers should not engage in direct dealings with insureds who are also clients of independent agents. According to Miniter, Ohio's violation of this custom further supports Miniter's claim for breach of the no- contact agreement. England defines the industry custom as an obligation by Ohio not to engage in continuous dealings or discussions, regardless of whether Shawmut initiated the -20- 20 contact, without first seeking to involve Miniter. The facts in this record do not support Miniter's assertion that Ohio violated industry custom. During the first call from Grondin, Juredine urged Shawmut to officially resolve the situation with Miniter prior to moving forward. Juredine then called Donley to inform him of the situation. Notably, Donley did not clarify to Ohio whether or not Shawmut had terminated Miniter. He merely exhorted Juredine not to negotiate with Shawmut without his involvement. We conclude that Ohio made a good faith effort to abide by the custom in the industry as England describes it. B. Miniter's Remaining Claims ______________________________ In addition to breach of contract, Miniter alleged breach of the implied covenant of good faith and fair dealing, intentional interference with advantageous relations, unjust enrichment, and violation of the Massachusetts unfair trade practices statute, Mass. Gen. Laws ch. 93A. Each of these claims rests in large part on the conduct which has failed to support Miniter's claim for breach of the no contact agreement. We find each of Miniter's arguments on appeal unpersuasive. For the sake of thoroughness, however, we discuss each of them in turn. 1. Breach of the Implied Covenant of Good Faith ___________________________________________________ and Fair Dealing ____ ____________ Miniter alleged that Ohio's breach of the no contact agreement violated the implied covenant of good faith -21- 21 and fair dealing. The district court granted summary judgment in favor of Ohio, determining that "Ohio courts have declined to recognize the doctrine in an at-will employment context." On appeal Miniter argues alternatively that Ohio does recognize the implied covenant in this context and that the district court should have applied Massachusetts law, which recognizes the implied covenant in every contract. Appellee Ohio, by contrast, seeks to apply the law of the state of Ohio, arguing that Ohio law does not recognize Miniter's claim. We need not determine which state's law governs. Even if, as Miniter contends, the common law of Ohio recognizes a cause of action for breach of the implied covenant of good faith and fair dealing, Miniter has not discussed how Ohio law would apply in this case. Instead, Miniter argues the merits of this claim only under the law of Massachusetts. We have indicated that "issues adverted to on appeal in a perfunctory manner, unaccompanied by some developed argumentation, are deemed to have been abandoned." Ryan v. Royal Ins. Co. of Am., 916 F.2d 731, 714 (1st Cir. ____ ______________________ 1990); see also Williams v. Poulos, 11 F.3d 271, 285 (1st ___ ____ ________ ______ Cir. 1993). We conclude, moreover, that Miniter cannot prevail under the law of Massachusetts.  As we have recognized, "Massachusetts law implies a duty of good faith and fair dealing in every existing -22- 22 contract." F.D.I.C. v. LeBlanc, 85 F.3d 815, 822 (1st Cir. ________ _______ 1996); see also Anthony's Pier Four v. HBC Assoc., 583 N.E.2d ___ ____ ___________________ __________ 806, 820 (Mass. 1991). Under this implied covenant, "'neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" Anthony's Pier Four, ___________________ 583 N.E.2d at 820 (quoting Drucker v. Roland Wm. Jutras _______ __________________ Assocs., 348 N.E.2d 763, 765 (Mass. 1976)). The existence of _______ the covenant in no way depends on the level of sophistication of the parties. Massachusetts law implies the covenant even in contracts between sophisticated business people. See id. ___ ___ at 821.  According to Miniter, Ohio dealt directly with Shawmut in breach of the no contact agreement and falsely indicated to Shawmut a willingness to pay the lump sum with the purpose of excluding Miniter from any deal, thereby eliminating Miniter's commissions. Miniter claims that Ohio's actions "were calculated and intended to subvert the relationship and to otherwise obtain the Shawmut account directly and eliminate Miniter's involvement and commission." Miniter, however, fails to identify evidence in the record that would establish a genuine issue of material fact whether Ohio acted in bad faith. The record indicates that by the time Shawmut began negotiating with Ohio Grondin had informed Juredine that Shawmut was no longer working through -23- 23 Miniter. Juredine, moreover, informed Donley of the situation shortly after he received Grondin's call. In short, the record does not support Miniter's contention that Ohio acted to destroy or injure Miniter's rights to the fruits of the contract. See Anthony's Pier Four, 583 N.E.2d ___ ___________________ at 820. Assuming Massachusetts law governs this claim, Miniter fails to point to record evidence supporting its allegations that Ohio acted in bad faith.4  ____________________ 4. Miniter's claim for unjust enrichment also fails. That claim is based on Miniter's argument that it introduced Shawmut to Ohio, that it brokered the initial policy, that Ohio went behind its back and dealt directly with Shawmut, that Ohio made misrepresentations to Shawmut, all with the result that Ohio benefited by gaining a new client. See ___ Salamon v. Terra, 477 N.E.2d 1029, 1031-32 (Mass. 1985) _______ _____ (remedy lies for value of benefit conferred). We have already concluded that rather than broker or facilitate the second policy, Miniter urged Shawmut to change carriers and represented to Shawmut that Ohio reneged on its lump sum offer. Our conclusion that Ohio did not engage in any wrongful conduct precludes any plausible assertion that Miniter conferred a benefit upon Ohio beyond the first policy.  -24- 24 2. Interference with Advantageous Relations  ____________________________________________ Miniter contends that the district court erred in granting summary judgment in favor of Ohio on its claim for interference with advantageous relations. A claim for interference with advantageous relations depends upon the presence of four criteria: "(1) a business relationship or contemplated contract of economic benefit; (2) the defendant's knowledge of such relationship; (3) the defendant's intentional and malicious interference with it; (4) the plaintiff's loss of advantage directly resulting from the defendant's conduct." Comey v. Hill, 438 N.E.2d 811, _____ ____ 816 (Mass. 1982); see also Speen v. Crown Clothing Corp., 102 ___ ____ _____ ____________________ F.3d 625, 634 (1st Cir. 1996). The Supreme Judicial Court of Massachusetts has indicated that the third element requires merely an improper interference, and not a malicious one. See United Truck Leasing Corp. v. Geltman, 551 N.E.2d 20, 23 ___ __________________________ _______ (Mass. 1990).5 Nevertheless, a successful claim must show something more than just the interference itself. See id. ___ ___ To the extent, therefore, that any of Ohio's actions could constitute an interference, that alone would not incur liability. Instead, Miniter must demonstrate wrongfulness  ____________________ 5. We note that in Geltman, the Supreme Judicial Court _______ specifically examined the tort of intentional interference with a contract and prospective contractual relations. The court indicated, however, that at least with respect to the third element, the same standard applied in both torts. See ___ id. at 23 n.6.  ___ -25- 25 beyond the interference itself. The interference must arise, for example, from improper motives or the use of improper means. See id. ___ ___ Miniter bases this claim yet again on its contention that Ohio engaged in direct dealings with Shawmut in violation of the no contact agreement and made injurious misrepresentations about the lump sum payment and Miniter. Our examination of the record has revealed no such conduct. Miniter points to nothing in addition to the facts we considered in relation to Miniter's breach of contract claims that might support a claim for intentional interference with advantageous relations. In the absence of record evidence upon which a reasonable jury could find an improper interference, Miniter cannot survive summary judgment on this claim.  3. Breach of Fiduciary Duty/Mass. Gen. Laws ch. ___________________________________________________ 93A ___ Finally, Miniter appeals the grant of summary judgment in favor of Ohio on its claim under Mass. Gen. Laws ch. 93A ("93A") based on breach of fiduciary duty. Section 2(a) of Mass. Gen. Laws ch. 93A provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Section 11 extends 2's general protection to commercial parties. See Mass. Gen. Laws ch. ___ -26- 26 93A 11; Industrial Gen. Corp. v. Sequoia Pac. Sys. Corp., ______________________ ________________________ 44 F.3d 40, 43 (1st Cir. 1995). Whether a particular set of facts constitutes unfair or deceptive acts or practices ordinarily is a question of fact. See id. The parameters of ___ __ conduct the factfinder may consider, however, is a question of law. See id. at 44. ___ ___ To fall within these parameters, the conduct which undergirds the complaint must reside "within at least the penumbra of some common-law, statutory or other established concept of unfairness," or rise to the level of immoral, unethical, oppressive or unscrupulous, and result in substantial injury to competitors or other business people. Id. (internal quotations and citations omitted). At bottom, ___ a claim under 93A must rest on conduct that attained "'a level of rascality that would raise the eyebrow of someone inured to the rough and tumble of the world of commerce.'" See id. at 43 (quoting Quaker St. Oil Ref. Corp. v. Garrity ___ ___ _________________________ _______ Oil Co., 884 F.2d 1510, 1513 (1st Cir. 1989) (internal ________ quotation omitted)).  Miniter contends that the agency agreement placed it and Ohio in a fiduciary relationship, the contours of which derive from "the established obligations imposed in the industry that an insurer is obligated to refrain from interfering with an independent agent's property right in expirations [and] the concomitant prohibition against -27- 27 engaging in direct dealings with the insured while the agent remains the broker of record." We agree with Miniter that breach of a fiduciary duty might constitute a 93A violation. See Sequoia Pac. ___ _____________ Sys., 44 F.3d at 44. We conclude, however, that Ohio did not ____ breach its duty. Miniter supports its 93A claim with mischaracterizations of the record upon which we have elaborated. In short, Ohio did not make the misrepresentations Miniter claims, nor did it violate its written or oral agreements. The record further reflects that Ohio adhered to the industry custom as described by Miniter's expert, Frederick England. As such, Ohio did not breach a fiduciary duty to Miniter. Miniter's 93A claim based on breach of fiduciary duty, therefore, fails. Affirmed. Costs to appellee. Affirmed. _________ -28- 28