In re ADELPHIA COMMUNICATIONS
CORP., et al., Debtors.

Gerald Dibbern, individually and on
behalf of all others similarly
situated, Plaintiff,

v.

Adelphia Communications Corp., John
Does 1–20 and XYZ Company
Nos. 1–50, Defendants.

Bankruptcy No. 02–41729 (REG).
Adversary No. 02–8074 (REG).

United States Bankruptcy Court,
S.D. New York.

May 3, 2005.

Law Offices of Stephen V. Saia, by Stephen V. Saia, Esq. (argued), Pembroke, MA, Johnson & Perkinson, by Jacob B. Perkinson, Esq., South Burlington, VT, for plaintiff Gerald Dibbern.

Willkie, Farr & Gallagher, by Brian E. O'Connor, Esq. (argued), Joanna Rotgers, Esq., for defendant Adelphia Communications Corp.

RÒBERT E. GERBER, Bankruptcy Judge.

In this adversary proceeding under the umbrella of the jointly administered chapter 11 cases of Adelphia Communications Corporation ("Adelphia") and its subsidiaries, plaintiff Gerald Dibbern—a basic service tier only ("BST-only") subscriber to Adelphia cable television service in Massachusetts—asserts a variety of causes of action for alleged overcharges by the unnamed Adelphia subsidiary with whom he did business (the "Massachusetts Subsidiary").[1] Dibbern bases his claims on the Massachusetts Subsidiary's alleged failures to tell him, after his local system was upgraded, that he no longer needed a cable converter box. He alleges that, as a result, he was charged for a cable converter box that he did not need.

Dibbern makes like claims on behalf of a nationwide class of "Adelphia" consumers, who allegedly similarly did not need cable converter boxes but were not told that. He seeks class action certification for that nationwide class.[2]

Dibbern asserts causes of action for violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law[3] ("UTPCPL"), common law fraud, breach of contract, unjust enrichment, for an accounting, and for the imposition of a constructive trust.

---

1. Dibbern names as defendants "XYZ Company Nos. 1–50" as entities unknown to him who were responsible for his injuries, and after having sued them under fictitious names, asks leave to amend his complaint to name them at such time as such entities are ascertained. In its responsive papers, Adelphia identifies the Massachusetts Subsidiary as Adelphia Cablevision Corporation, a matter that presumably will not be disputed, but as the complaint is silent on this, and distinctions between the Massachusetts Subsidiary and defendant Adelphia may be significant, the Court believes it more appropriate to refer to the Massachusetts Subsidiary when the context so requires.

2. The Court has some uncertainty as to the propriety of class certification—particularly of a nationwide class, of subscribers of different cable systems, served by different debtors, who received different communications from their local service providers—given Dibbern's failure to allege in other than conclusory terms that all of the other customers were told (or not told) the same things, and were subject to the same regulatory obligations. And the Court's concerns in this regard remain even after consideration of Dibbern's supplemental submission, which notes the certification (with respect to claims against another cable company charged with similar wrongdoing) of a *statewide* class, and of a nationwide class *for settlement purposes.* However, in light of its disposition of the issues here, the Court does not have to reach class certification issues at this time.

3. Pa. Stat. Ann. tit. 73, §§ 201–1 through 201–9.2.

Adelphia moves to dismiss under Fed. R.Civ.P. 12(b)(6). Adelphia's motion is granted.

### Procedural History

Dibbern first brought an action against Adelphia on June 18, 2002, in Pennsylvania state court. Dibbern alleged in the state court action, as he alleges here, that Adelphia had charged, and continues to charge, BST-only cable subscribers for unnecessary cable converter boxes. The complaint in the state court action asserted a claim under the Pennsylvania UTPCPL, as well as claims for breach of contract and fraud. Shortly thereafter, on June 25, 2002, Adelphia and many of its subsidiaries filed (for unrelated reasons) the chapter 11 cases that are now pending in this Court, and Dibbern's state court action was stayed.

On July 8, 2002, Dibbern filed a "class" proof of claim—on his own behalf and on behalf of a nationwide class of subscribers assertedly similarly situated—alleging that "Adelphia" improperly billed him for the rental of two cable converter boxes.[4] His bills, some of which were attached to his proof of claim, included monthly charges of $3.20 for "Converter Rental," except that his August 2001 and September 2001 bills reflected a monthly charge of $6.50 for "Converter Rental." Dibbern listed the amount of his claim as ranging from $815 million to $1.191 billion.

Dibbern then filed this adversary proceeding, again as a nationwide class action, raising issues that largely overlap with those that he had raised in his proof of claim. Insofar as relevant to Adelphia, the complaint in this adversary proceeding made the same allegations and asserted the same claims as in the complaint in the earlier state court action, except that claims for unjust enrichment, an accounting, a constructive trust, non-dischargeability, and subordination were added. Dibbern later amended his complaint, dropping the claims for nondischargeability and subordination. The Court's further references to his allegations are to his complaint as amended (the "Amended Complaint").

### Facts

Parsed of duplicative allegations, and characterizing the allegations in Dibbern's favor, his Amended Complaint alleges the following.

#### Basic Factual Allegations

As alleged in the Amended Complaint, and taken as true for the purposes of this motion, Dibbern is a resident of Massachusetts, and has been a BST-only customer of "Adelphia" or its predecessors for six years.[5] Dibbern had been a subscriber of Harron Communications, Corp. ("Harron"), which was acquired by Adelphia in April 1999. Dibbern rented two converter boxes and was charged between $1.60 and $3.25 per box per month, which amounts

---

4. Dibbern's May 2001 bill, included with his proof of claim, contained the following notice:
EFFECTIVE IMMEDIATELY CUSTOMERS WHO DO NOT SUBSCRIBE TO *ANALOG* PREMIUM CHANNELS (HBO, CINEMAX, SHOWTIME OR NESN), OR ENJOY ORDERING PAY–PER–VIEW, NO LONGER NEED A CONVERTER BOX, PROVIDED THAT THEIR TELEVISION IS *CABLE READY.* CONVERTERS MAY BE RETURNED TO YOUR LOCAL ADELPHIA OFFICE.

Dibbern's September 2001 bill, also included with his proof of claim, contained the following notice:
REMINDER TO OUR CUSTOMERS WITH BASIC OR CABLE PLUS SERVICE ONLY, CONVERTER BOXES ARE NO LONGER NEEDED TO RECEIVE THESE SERVICES.

5. *Id.* ¶ 9.

he paid by making payments to a post office box in Pennsylvania.[6] Prior to Adelphia's acquisition of Harron, Harron's BST-only subscribers, including Dibbern, needed to rent cable converter box equipment to view basic programming.[7]

At the time of the acquisition of Harron in April 1999, Adelphia announced that it expected to consolidate the majority of Harron's cable systems with existing Adelphia cable systems, and estimated that at the time of closing on its acquisition of Harron, approximately 67% of Harron's cable plant would be upgraded.[8] The acquisition of Harron and the upgrade of the former Harron system rendered unnecessary the converter boxes that Dibbern rented from Adelphia.[9]

In other allegations, apparently not relating to his own cable service,[10] Dibbern alleges that between May 1997 and November 2000, Adelphia made a series of acquisitions of cable systems, and integrated those systems into its existing systems. Adelphia also upgraded those cable systems, and integrated them into its existing systems. Thus, for those other systems too, it became unnecessary for BST-only subscribers with cable-ready televisions to continue to rent converter box equipment from Adelphia.

Then, in further allegations (once more relating to his own cable service), Dibbern alleges that in May 2001, Adelphia disclosed[11] (the "May 2001 Notice") to its subscribers on their billing statements that they no longer needed to rent cable converter box equipment for BST-only service if they had cable-ready televisions.[12] Allegedly, the May 2001 Notice came too late, and was inadequate to apprise subscribers that they no longer needed to rent cable converter box equipment for BST-only service if they had cable-ready televisions.[13]

In a second notice in September 2001 (the "September 2001 Notice"), Adelphia again disclosed to its subscribers on their billing statements that they no longer needed to rent cable converter boxes for BST-only service if they had cable-ready televisions.[14] Allegedly, this disclosure also came too late and was insufficient.

*Legal Contentions and Mixed Questions of Fact and Law*

In the context of the foregoing, Dibbern makes a number of further contentions, which are contentions of law or mixed questions of fact and law. He alleges that:

(a) "Federal rules require defendants to provide at least 30 days notice to subscribers before implementing any change in services;"[15]

6. *Id.* ¶ 16.

7. *Id.* ¶ 26.

8. *Id.* ¶ 25.

9. *Id.* ¶¶ 25, 28.

10. *Id.* ¶¶ 19–32. These allegations appear to relate to cable systems other than the one that provided Dibbern with his service, and to the extent that they refer to subscribers at all, to refer to subscribers other than Dibbern.

11. The Amended Complaint says "quietly" disclosed. As the Amended Complaint itself recognizes, what Dibbern claims was concealed was, in fact, disclosed, in mailings to subscribers with their bills. Dibbern has cited no authority to this Court suggesting that its "quietly" characterization changes the fact of the disclosure.

12. Am. Compl. ¶ 36. The disclosure, included within the exhibits to Dibbern's proof of claim, is quoted in full at note 4 above.

13. *Id.*

14. *Id.* ¶ 41. Again, the Amended Complaint says "quietly" disclosed.

15. *Id.* ¶ 33 (citing 47 C.F.R. § 76.964(h)).

(b) "Federal law requires that defendants 'provide notice of service and rate changes to subscribers using any reasonable written means at its sole discretion;'" [16] and

(c) "Accordingly, defendants had a duty to disclose to plaintiff and members of the class, pursuant to 47 C.F.R. § 76.964(h) and 47 U.S.C. § 552(c), the upgrade and change of service which rendered unnecessary the converter boxes." [17]

Dibbern then goes on to say that the defendants knowingly and/or recklessly: [18]

· "failed to notify plaintiff and members of the class of this change in cable service;"

· "failed to cease billing plaintiff and members of the class for unnecessary rental fees;" and

· "engaged in unfair and deceptive business practices designed to induce plaintiff and members of the class to pay for unnecessary cable converter box equipment."

Dibbern also alleges that the defendants knowingly or recklessly:

· "failed to provide adequate notice to plaintiff and the class members that

they no longer needed to rent cable converter box equipment . . . in order to receive basic cable services;" [19]

· "failed to provide adequate notice to plaintiff and the class members that they were entitled to purchase a compatible cable converter box from a retail vendor other than defendant as required by . . . [s]ection 544a;" [20]

· "failed to advise plaintiff and the class members that they had paid or would pay cable converter box rental fees in excess of the actual cost of the equipment;" [21]

· "disregarded from their records which subscribers had BST-only service and which subscribers did not need to rent the converter box equipment," [22] when continuing to include rental charges for such in customer bills,[23] even though they "had an obligation to cease billing plaintiff and members of the class, independent of the notice requirements . . . ." [24]

As a consequence, Dibbern alleges that from at least April 12, 1999 (the date on which Adelphia acquired Harron), and continuing until the date of the filing of the Amended Complaint (in November 2002),

---

16. *Id.* ¶ 34 (citing 47 U.S.C. § 552(c)). Dibbern later cites another federal statute, 47 U.S.C. § 544a, captioned "Consumer electronics equipment compatibility," for the proposition that Adelphia was required:

> [T]o use technologies that prevent signal thefts while permitting consumers to benefit from new and recent models of television receivers and VCRs that contain premium features and functions, including the ability to use the cable-ready functions of such devices, without the need to rent cable converter box equipment . . . [and] to promote the commercial availability, from cable operators and retail vendors that are not affiliated with cable systems, of converter boxes and of remote control devices compatible with [Adelphia's] converter boxes.

Am. Compl. ¶¶ 44, 45.

However, Dibbern does not allege that there is a private right of action under 47 U.S.C. § 552(c), 47 U.S.C. § 544a, or 47 C.F.R. § 76.964(h).

17. Am. Compl. ¶ 35.

18. *Id.*

19. *Id.* ¶ 46.

20. *Id.* ¶ 47.

21. *Id.* ¶ 48.

22. *Id.* ¶ 49.

23. *Id.* ¶ 50.

24. *Id.* ¶ 49.

"Adelphia" (individually and/or jointly with the XYZ Companies) knowingly or recklessly "engaged in unlawful schemes and course of conduct that induced plaintiff and class members to pay for cable converter box equipment rental through one or more of the following [six] unfair and/or deceptive acts and/or practices:"[25]

(a) improperly charging its BST-only customers for cable converter box equipment that was not required;

(b) "misrepresenting through its billing statements and/or suppressing material facts designed to confuse or mislead plaintiff and members of the class into believing that such rental charges were in fact proper;"

(c) "overcharging its BST-only customers the fair rental value of the equipment;"

(d) "fail[ing] to adequately advise plaintiff and the class members that there were alternatives to renting converter box equipment from Adelphia, including purchasing compatible cable converter box equipment capable of receiving its signal from a retail outlet;"

(e) "fail[ing] to adequately advise plaintiff and the class members that they no longer needed to rent cable converter box equipment;" and

(f) "engaging in offensive, unfair and deceptive business practices with the intention to mislead plaintiff and the class members."

All claims for damages are for such amount as is determined at trial. On Count I (for violation of the Pennsylvania UTPCPL), Dibbern seeks treble damages, plus attorneys' fees.[26] On Count II (for breach of contract), he seemingly seeks single damages.[27] On Count III (for fraud), he seeks single damages, as well as punitive damages.[28] On Count IV (for unjust enrichment), he seeks a disgorgement of the money improperly obtained.[29] On Count V (for an accounting), he seemingly seeks the same thing.[30]

### Discussion

### I.

### Assertion of Claims by Adversary Proceeding

As a threshold matter, the Court considers Adelphia's point that the allegedly wrongful acts took place prepetition, and thus should have been asserted through the claims process, rather than through the adversary proceeding that was commenced here. Though the Court finds numerous other deficiencies in Dibbern's claims, discussed below, it does not find a deficiency in this respect.

Disputed claims against an estate may be, and customarily are, heard as contested matters, where the procedures and due process protections are those characteristic of motion practice—albeit with full trials (or "evidentiary hearings") when there are material disputed issues of fact. But some types of controversies in bankruptcy court require a greater degree of procedural formality in their determination, and thus require the commencement of an adversary proceeding. They are listed in Fed. R. Bankr.P. 7001, and include, *inter alia*, proceedings for the recovery of money or property, and proceedings to obtain an "injunction or other equitable relief."

---

25. *Id.* ¶ 51.

26. *Id.* ¶ 76.

27. *Id.* ¶ 89.

28. *Id.* ¶¶ 100, 101.

29. *Id.* ¶ 106.

30. *Id.* ¶ 111.

If Dibbern wished merely to share in the Adelphia estate (or, more precisely, though he seems to have glossed over this point, the estate of the particular Adelphia entity with whom he dealt), a contested matter would have been sufficient and preferable, as more consistent with the avoidance of unnecessary formality and expense, and as equally consistent with due process. But here Dibbern also sought equitable relief—the imposition of a constructive trust—which, to the extent it could be asserted at all, would require the commencement of an adversary proceeding.

■ Moreover, Dibbern's adversary proceeding was brought before *this* Court, which would have the same core jurisdiction in evaluating Dibbern's efforts to share in the Adelphia *res* irrespective of the procedural vehicle that he used. Because Dibbern sued on his prepetition claims in *this* Court, his assertion of those claims here was not violative of the automatic stay provisions of Bankruptcy Code sections 362(a)(1)and (a)(3), as would have been the case if those claims had been asserted elsewhere.[31] In addition, it is clear, at least in this Circuit, that Adelp-

hia's creditors and stakeholders would have the ability to intervene in this adversary proceeding if they wished,[32] just as they could be heard in connection with the disputed claim contested matter—as creditors might wish to do if they wanted to protect their recoveries from the dilution of a senior $1 billion claim, or contentions that such a claim had priority over general unsecured creditors. And most importantly, Adelphia and its creditors would have no fewer due process procedural rights in this adversary proceeding than they would have if Dibbern had proceeded by contested matter.

Accordingly, the Court concludes that Dibbern's commencement of an adversary proceeding was, if not preferable, at least not wrongful.

## II.

### Rule 12(b)(6) Standards

The standards for determination of a motion to dismiss under Fed.R.Civ.P. 12(b)(6), as made applicable to bankruptcy adversary proceedings under Fed. R. Bankr.P. 7012(b), are familiar.[33] As stated in *Ames*, *Lois/USA*, and other cases, under

---

**31.** *See Armco Inc. v. North Atlantic Ins. Co. Ltd. (In re Bird)*, 229 B.R. 90, 94 (Bankr. S.D.N.Y.1999) (Brozman, J.) (noting, in section 304 case, analogizing based on section 362 doctrine, that "[even where the debtor is the defendant, however, the automatic stay does not apply to actions] brought in the bankruptcy court where the debtor's case is pending."); *Shane v. Marceca (In re Marceca)*, 127 B.R. 328, 331 (Bankr.S.D.N.Y.1991) (Schwartzberg, J.) (holding that the automatic stay "does not operate to stay actions against the debtor brought in the bankruptcy court where the debtor's case is pending."); *Lighthouse Bluffs, Corp. v. Atreus Enters., Ltd. (In re Atreus Enters., Ltd.)*, 120 B.R. 341, 346 (Bankr.S.D.N.Y.1990) (Schwartzberg, J.) ("Any action to recover property, to collect money, to enforce a lien, or to assert a prepetition claim against the debtor which would otherwise be enjoined by 11 U.S.C. 362(a) if

initiated in any other context, is not subject to the automatic stay if commenced in the bankruptcy court where the debtor's bankruptcy case is pending."); *Prewitt v. North Coast Vill., Ltd. (In re North Coast Vill., Ltd.)*, 135 B.R. 641, 643 (9th Cir. BAP 1992) (Perris, J.) ("[t]he stay does not operate against the court with jurisdiction over the bankrupt.").

**32.** *See Term Loan Holder Comm. v. Ozer Group, L.L.C. (In re The Caldor Corp., Inc.)*, 303 F.3d 161, 169–70, 175–76 (2d Cir.2002); *Adelphia Communications Corp. v. Rigas (In re Adelphia Communications Corp.)*, 285 B.R. 848, 849–50 (Bankr.S.D.N.Y.2002) (Gerber, J.).

**33.** *See, e.g., Metro–Goldwyn–Mayer Home Entm't, Inc. v. Ames Dep't Stores, Inc. (In re Ames Dep't Stores, Inc.)*, 322 B.R. 238, 241 (Bankr.S.D.N.Y.2005); *The Official Comm. of*

well-settled principles, when considering a motion to dismiss under Fed.R.Civ.P. 12(b)(6), as made applicable under Fed. R. Bankr.P. 7012(b), a complaint's factual allegations are presumed true, and are construed in favor of the pleader.[34] "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."[35] As the Supreme Court held in *Scheuer v. Rhodes*:

> When a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test.[36]

Dismissal should be granted only when the plaintiff's allegations, taken as true, along with any inferences that flow from them, are insufficient as a matter of law.[37]

On a motion to dismiss, courts may consider certain documents in addition to the complaint, including the contents of any documents attached to the complaint or incorporated by reference; matters as to which it can take judicial notice; and documents in the possession of the non-moving party (Dibbern here) or documents which the non-moving party knew of or relied on in connection with its complaint.[38]

### III.

### Substantive Claims

Based on Adelphia's alleged delay in telling him and others that they did not need the cable boxes they rented, and/or inadequate disclosure when they were so informed, Dibbern alleges six separate claims for relief. They are considered in turn.[39]

### A.

### Pennsylvania UTPCPL

Dibbern's "Count I" alleges that the Pennsylvania UTPCPL applies to his

---

*Unsecured Creditors v. Conseco Fin. Servicing Corp. (In re Lois/USA, Inc.)*, 264 B.R. 69, 89–90 (Bankr.S.D.N.Y.2001).

**34.** *See, e.g., Luedke v. Delta Air Lines, Inc.*, 159 B.R. 385, 389 (S.D.N.Y.1993) (Patterson, J.) (applying this standard, denying motion to dismiss third-party complaint), *cited in In re Lois/USA, Inc.*, 264 B.R. at 89.

**35.** *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *accord Northrop v. Hoffman of Simsbury, Inc.*, 134 F.3d 41, 44 (2d Cir.1997) (quoting *Conley*); *ABF Capital Mgmt. v. Kidder Peabody & Co., Inc. (In re Granite Partners, L.P.)*, 210 B.R. 508, 514 (Bankr.S.D.N.Y.1997) (Bernstein, C.J.) (denying motion to dismiss complaint, noting dismissal would be proper only when the plaintiff would not be entitled to any type of relief, even if it prevailed on the merits of its factual allegations).

**36.** 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

**37.** *See, e.g., Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993), *cert. denied*, 512 U.S. 1240, 114 S.Ct. 2749, 129 L.Ed.2d 867 (1994) (No. 93–8579) (applying the standard discussed above, but nevertheless dismissing, where claims for relief were legally insufficient); *80 Nassau Assocs. v. Crossland Fed. Savings Bank (In re 80 Nassau Assocs.)*, 169 B.R. 832, 841 (Bankr.S.D.N.Y.1994) (Bernstein, C.J.).

**38.** *See Granite Partners*, 210 B.R. at 514.

**39.** Adelphia argues that two of them—the claims for an accounting and for imposition of a constructive trust—are in essence remedies, and not separate claims for relief. Though there is support for Adelphia's position in this regard, the Court notes their hybrid aspects, and believes they warrant substantive discussion in any event.

dealings with his local Massachusetts cable provider, and that the Pennsylvania UTPCPL was violated. He also alleges, as the predicate for these claims, that alleged failures to comply with federal cable television regulations give rise to unfair or deceptive trade practices under the Pennsylvania statute. Adelphia does not concede that it acted fraudulently in any way,[40] but argues that even taking the factual allegations of the complaint as true, the Pennsylvania UTPCPL was not intended to cover consumers who, like Dibbern and the bulk of the class he wishes to represent, are neither residents of the Commonwealth of Pennsylvania, nor obtained goods or services in Pennsylvania. Adelphia further argues that there is no indication that the Pennsylvania legislature intended to make violations of the federal cable television regulations actionable under the Pennsylvania UTPCPL, and that the remedies for any failures to comply with the federal regulations lie with the FCC and/or local cable television regulatory authorities. The Court agrees with Adelphia in each of these respects.

### 1. Standing to Sue

Considering the extraterritorial application issue first, the Court starts, as usual, with the words of the statute.[41] Dibbern never quotes the provisions on which he relies in his Amended Complaint, but he cites sections 1, 2, 3, and 9.2 of the Pennsylvania UTPCPL, §§ 201–1, 201–2, 201–3, and 201–9.2, respectively, as its bases.[42] The first of them, section 1, merely sets out the statute's short title.[43] Then, after section 2 sets out the statutory definitions, section 3 makes "unfair methods of competition" and "unfair or deceptive acts or practices" (as defined in section 2), in the conduct of "any trade or commerce" (also as defined in section 2), unlawful.[44] Finally, section 9.2 creates a private right of action for practices declared unlawful under section 3 with prescribed rights of recovery, including treble damages in the discretion of the court.[45]

---

40. *See* Adelphia Reply Mem. (Adv. Pro. ECF # 18) at n. 13.

41. *See, e.g., In re Ames Dept. Stores, Inc.,* 306 B.R. 43, 65 (Bankr.S.D.N.Y.2004) (Gerber, J.) ("As usual, the Court starts with the words of the relevant statutory provisions."); *PSINet, Inc. v. Cisco Sys. Capital Corp. (In re PSINet, Inc.),* 271 B.R. 1, 12 (Bankr.S.D.N.Y.2001) (Gerber, J.) ("The Court starts with the words of the statute."); *see also In re Indesco Int'l, Inc.,* 2005 WL 681454, at *7 & n. 16 (Bankr. S.D.N.Y. Mar.25, 2005) (quoting *Ames* and *PSINet*).

42. *See* Am. Compl. ¶¶ 4, 7, 65, 66, 71, 72, 74, 75, 76, and "Count I" heading preceding ¶ 63.

43. Section 1, § 201–1, provides in full:
This act shall be known and may be cited as the "Unfair Trade Practices and Consumer Protection Law."

44. As relevant here, section 3, § 201–3, provides:
Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce as defined by subclauses (i) through (xxi) of clause (4) of section 2 of this act [§ 201–2] ... are hereby declared unlawful.

45. Section 9.2, § 201–9.2, provides, in relevant part:

Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act [§ 201–3], may bring a private action, to recover actual damages or one hundred dollars ($100), whichever is greater. The court may, in its discretion, award up to three times the actual damages sustained, but not less than one hundred dollars ($100), and may provide such additional relief as it deems necessary or proper. The court may award, to the plaintiff, in addition to other relief provided in this section, costs and reasonable attorney fees.

In determining whether the Pennsylvania legislature intended to protect citizens outside the Commonwealth of Pennsylvania, the Court starts with the language of sections 2, 3, and 9.2. None of those says in so many words whether the Pennsylvania UTPCPL protects citizens of states other than Pennsylvania when they obtain goods and services in question elsewhere, but section 2 comes very close to doing so, by its definition of "trade" and "commerce." Section 2 provides that "[a]s used in this act," *i.e.*, the Pennsylvania UTPCPL:

> "**Trade**" and "**commerce**" mean the advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value *wherever situate,* and *includes any trade or commerce directly or indirectly affecting the people of this Commonwealth.*[46]

While subsection 3 of section 2 makes clear that the property and services may be located anywhere ("wherever situate"), it goes on to underscore the legislative concern: "any trade or commerce *directly or indirectly affecting the people of this Commonwealth.*" (emphasis added). Subject to anything that might lead to a different conclusion, that evidences, to this Court's thinking, an intent to cover property or services provided anywhere, so long as such property or services are provided to the people of Pennsylvania.

To be sure, however, the reference to the "people of this Commonwealth" is preceded by an "includes," which traditionally has been perceived to be non-exclusive. The Court therefore considers whether, notwithstanding the obvious desire to protect citizens of the Commonwealth of Pennsylvania, there was also a like concern to protect all of the other citizens of the United States, even when they do not come into Pennsylvania. The Court finds that there is no basis for finding such an intent.

The Court must reject Dibbern's contention that the expression "wherever situate" is relevant, much less dispositive, of this issue. For that language, by its terms, refers to the property and/or services that underlie the claims of fraud or unfair practices, and does not go to the zone of people that is protected by the statute. Since language is construed "by the company it keeps"[47]—and the neighboring language refers to the people of Pennsylvania—the "wherever situated" language appears to express the intent that Pennsylvania citizens should not be defrauded, even when the goods or services that underlie the fraud are located elsewhere. But it does not evidence an intention that businesses in Pennsylvania be subjected to liability to consumers across the country based solely on the locus of the Pennsylvania business.

For those people whom the Pennsylvania legislature wished to protect, there is no question that the Pennsylvania UTPCPL is to be interpreted broadly.[48] But the language of the Pennsylvania

---

46. § 201–2(3) (emphasis added).

47. *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 562, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995); *Dietrich v. Bauer*, 1996 WL 709572, at *6 (S.D.N.Y. Dec.10, 1996) (McKenna, J.) (citing *Gustafson*); *Calgarth Invs., Ltd. v. Bank Saderat Iran*, 1996 WL 204470, at *4 (S.D.N.Y. Apr.26, 1996) (Mukasey, J.) (same).

48. *See Zwiercan v. General Motors Corp.*, 2002 WL 31053838, at *3 (Pa. D. & C.4th Sept. 11, 2002) (citing *Commonwealth of Pennsylvania v. Monumental Props., Inc.*, 459 Pa. 450, 329 A.2d 812, 816–17 (1974), and stating that the "Pennsylvania Supreme Court mandated that the UTPCPL is to be liberally construed to prevent unfair or deceptive practices and place the seller and consumer on more equal footing.").

UTPCPL does not evidence a statutory intention to have it apply in situations where the goods and services in question were not provided in Pennsylvania, nor were they provided to Pennsylvania residents.[49] Dibbern has not come forth with any legislative history to support such a view. Nor has he come forward with any caselaw upholding such a construction of the Pennsylvania UTPCPL, or provided an example where a Pennsylvania court *allowed* a non-resident plaintiff to pursue a claim under the Pennsylvania UTPCPL. While Adelphia likewise has not cited a case where a court *prevented* a non-resident plaintiff from asserting rights under the Pennsylvania UTPCPL, this Court is reluctant to take the counter-intuitive step of finding a purpose of nationwide consumer protection in the absence of some indication that such is what the Pennsylvania legislature intended.

In the absence of guidance from Pennsylvania lawmakers and courts, the Court looks to decisions from other jurisdictions addressing the same issue. Those decisions overwhelming require a denial of standing here.

In *Lyon v. Caterpillar, Inc.*[50]—a case in which, as here, class certification was sought for a nationwide class of allegedly defrauded consumers under a single state's consumer protection statute—the court denied a class certification motion, in material part because of doubts as to the extent to which the applicable statute (there the consumer protection statute of Illinois) would be applicable to all of the members of the proposed nationwide class. In a thorough decision, the *Lyon* court observed, as part of its extensive analysis in that regard, that "[s]tate consumer fraud acts are designed to either protect state residents or protect consumers engaged in transactions within the state."[51] Although the *Lyon* court did not definitively decide the choice-of-law issue (finding

**49.** The Court must reject Dibbern's overly enthusiastic claim that the Pennsylvania UTPCPL *"unambiguously"* establishes standing and a private right of action for non-resident consumers against in-state sellers. (Dibbern Opp'n (Adv. Pro. ECF # 16) at 22) (italics in original). As its statutory language, quoted in full above, makes clear, the Pennsylvania UTPCPL hardly does that, and by focusing its definition of trade or commerce on the protection of Pennsylvania consumers, it more clearly leans in the opposite direction. At best, the statutory language is ambiguous.

**50.** 194 F.R.D. 206 (E.D.Pa.2000) (Brody, J.).

**51.** *Id.* at 215. *See also id.* at 216 ("[S]tate consumer protection acts are designed to protect the residents of the states in which the statutes are promulgated."). *See also Stone St. Servs., Inc. v. Daniels,* 2000 WL 1909373, at *5 (E.D.Pa. Dec.29, 2000) (Padova, J.) (declining to apply the Pennsylvania UTPCPL in place of the consumer protection statute of Kansas, the state in which the consumer Daniels lived, merely by reason of the fact that Stone Street Services was a Pennsylvania corporation; "[s]tate consumer protection laws are designed to protect the residents of the states in which the statutes are promulgated," quoting *Lyon*). *See also Wilks v. Ford Motor Co. (In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.),* 174 F.R.D. 332 (D.N.J.1997) (Simandle, J.) (denying class certification in litigation involving, *inter alia,* claims under consumer fraud statutes with respect to defective auto parts, and considering the claim that the law of a single jurisdiction should apply). The *Ford Motor* court regarded it as more appropriate to apply "the law of each of the states from which plaintiffs hail," observing that:

Each plaintiff's home state has an interest in protecting its consumers from in-state injuries caused by foreign corporations and in delineating the scope of recovery for its citizens under its own laws. These interests arise by virtue of each state being the place in which plaintiffs reside, or the place in which plaintiffs bought and used their allegedly defective vehicles or the place where plaintiffs' alleged damages occurred.

*Id.* at 348.

such was unnecessary to a class certification determination),[52] it was heavily influenced by its repeated concerns as to the superior regulatory interests of the class members' home states.[53] In facts, courts have routinely applied the consumer protections law of the plaintiff's state of residence to test the merits of a plaintiff's claim. Such concerns similarly caused the court in *Tylka v. Gerber Prods. Co.*[54] to limit the size of a class for which certification was sought in an action under the Illinois Consumer Fraud and Deceptive Business Practices Act to those who were Illinois consumers, or those who, although nonresidents, had purchased the allegedly misrepresented items in Illinois.[55]

Though each decision must be examined in light of the statutory language it construed, the Court finds particularly persuasive the decision in *Goshen v. Mutual Life Ins. Co. of New York.*[56] There, the New York Court of Appeals, New York's highest court, refused to extend the protection of New York's state consumer protection statute to non-resident plaintiffs. In *Goshen*, the plaintiff had bought insurance in Florida, and because the transaction itself did not occur in New York State, the court held that he could not make a claim under New York's consumer protec-

tion statute against the New York-based insurance provider. The *Goshen* court considered whether "an allegedly deceptive scheme that originates in New York, but injures a consumer in a transaction outside the state, constitutes an actionable deceptive act or practice under [New York's Consumer Protection Act]."[57] The New York Court of Appeals noted, as Pennsylvania courts had noted similarly with respect to the Pennsylvania UTPCPL, that New York's Consumer Protection Act[58] was intended to provide broad protection to consumers.[59] But the Court of Appeals found that the broad scope of New York's Consumer Protection Act did not extend to protect citizens outside the borders of the state of New York, even with allegations of "hatching a scheme" within New York.[60]

As is to be expected, the *Goshen* court's analysis was driven heavily by the words of the statute. It found that the New York statute's language declaring unlawful "deceptive practices in 'the conduct of any business, trade or commerce or in the furnishing of any service *in this state*' unambiguously evinces a legislative intent to address commercial misconduct occurring within New York."[61] It went on to state that:

---

52. *See Lyon,* 194 F.R.D. at 218 n. 17.

53. *See, e.g., id.* at n. 16 ("Several Eastern District of Pennsylvania courts have held that each class member would be subject to the consumer fraud statutes of his or her state of residence because that state would have the paramount interest in applying its laws to protect its consumers.").
    Those concerns are magnified in an area regulated as heavily at the local level as cable television is, where states, municipalities, and other local franchising authorities impose individualized requirements on cable companies.

54. 182 F.R.D. 573 (N.D.Ill.1998).

55. *Id.* at 577.

56. 98 N.Y.2d 314, 774 N.E.2d 1190, 746 N.Y.S.2d 858 (2002).

57. *Id.* at 1193, 746 N.Y.S.2d 858.

58. N.Y. Gen. Bus. L. § 349.

59. *Goshen,* 774 N.E.2d at 1195, 746 N.Y.S.2d 858; *see generally* N.Y. Gen. Bus. L. § 349.

60. *Goshen,* 774 N.E.2d at 1195, 746 N.Y.S.2d 858 ("We conclude that the transaction in which the consumer is deceived must occur in New York.").

61. *Id.* (emphasis in Court of Appeals' decision).

The phrase "deceptive acts or practices" under the statute is not the mere invention of a scheme or marketing strategy, but the actual misrepresentation or omission to a consumer.... Thus, to qualify as a prohibited act under the statute, the deception of a consumer must occur in New York.[62]

It continued:

To apply the statute to out-of-state transactions in the case before us would lead to an unwarranted expansive reading of the statute, contrary to legislative intent, and potentially leading to the nationwide, if not global application of General Business Law 349.... Furthermore, the interpretation out-of-state plaintiffs would have us adopt would tread on the ability of other states to regulate their own markets and enforce their own consumer protection laws.[63]

The *Goshen* court held that application of the New York statute would not turn on the residency of the parties; it would instead protect consumers in their transactions that take place in New York State. And though they do so in somewhat different ways, the New York and Pennsylvania statutes take a common, local protection, approach. The Pennsylvania statute, in its version of this approach, defines "Trade" and "Commerce" as "includ[ing] any trade or commerce directly or indi-

rectly affecting the people *of this Commonwealth*"[64]—focusing more than the New York statute did on the protection of the legislating state's own citizens, rather than on the situs of the injury to the protected consumer. But just as the New York statute's language was construed by the *Goshen* court as not warranting an extraterritorial imposition of New York law on citizens who neither resided in New York nor were injured in New York, the Pennsylvania UTPCPL, in this Court's view, should be construed likewise, especially in light of its stated focus on protecting Pennsylvania consumers. The *Goshen* court found that the New York statute *"was not intended to police the out-of-state transactions of New York companies,"*[65] and this Court sees no indication that the Pennsylvania UTPCPL was intended to act any differently, at least in situations where the affected consumers were not citizens of the Commonwealth of Pennsylvania.

This Court's conclusion in that regard is reinforced by the decisions in Illinois. Illinois has a split in its caselaw, with some courts wholly refusing to allow non-resident plaintiffs standing under the Illinois consumer protection statute,[66] while others allow non-residents to sue if their lawsuit is based on transactions that occurred within Illinois.[67] But under both ap-

62. *Id.* (citations omitted).

63. *Id.* at 1196, 746 N.Y.S.2d 858.

64. Pa. Stat. Ann. tit. 73, § 201–2(3) (emphasis added).

65. *Goshen,* 774 N.E.2d at 1196, 746 N.Y.S.2d 858 (emphasis added).

66. *See Swartz v. Schaub,* 818 F.Supp. 1214 (N.D.Ill.1993).

67. *See Tylka,* 182 F.R.D. at 573; *see also Peters v. The Northern Trust Co.,* 1999 WL

515481, at *13 (N.D.Ill. July 15, 1999) (court examined this split in Illinois consumer protection case law, and found that the Illinois courts refused to allow non-resident plaintiffs to invoke the Illinois consumer protection statute because (1) they were not residents of Illinois, *and* (2) the conduct underlying their claim did not take place in Illinois).
*See also Steed Realty v. Oveisi,* 823 S.W.2d 195, 198–99 (Tenn.Ct.App.1991) (while the court agreed that the Tennessee Consumer Protection Act protected non-resident Mississippi plaintiffs, the seller had advertised through both press and broadcast media in Tennessee, held the real estate closings in

proaches, the Illinois caselaw does not subject Illinois entities to suit on a nationwide basis, as Dibbern would do here, merely by reason of those entities' activities in Illinois, when the plaintiff (or proposed class member) is neither a resident of Illinois nor came into the state to do business with the Illinois defendant. Thus, under the first of the two Illinois approaches, nonresidents like Dibbern and other out-of-state class members would lack standing altogether, while under the second approach, they would have the requisite standing if (but only if) they had come to Pennsylvania and then had been defrauded. Obviously, neither of the Illinois approaches would permit a suit like Dibbern's here.

Dibbern relies principally on a decision construing New Jersey's Consumer Fraud Act, *Boyes v. Greenwich Boat Works, Inc.*[68] Dibbern argues that *Boyes* supports his contention that the Pennsylvania legislature "intended that the UTPCPL apply to sales by Pennsylvania sellers even if the buyer (*i.e.* consumer) is an out-of-state residents [*sic.*] and some aspect of the transaction took place outside the Commonwealth."[69] But this is too much of a stretch. *Boyes* had nothing to do with the extent to which the Pennsylvania UTPCPL should be applied to "sales by Pennsylvania sellers," and, indeed, given its facts, did not even have anything to do with whether *New Jersey's* consumer protection statute should be applied to transactions with purchasers who had not come into New Jersey.

*Boyes* involved claims for fraud, breach of warranty, and violation of New Jersey's Consumer Fraud Act with respect to a face-to-face transaction for the sale of a boat that did not measure up to the seller's representations. It was, in the respects relevant here, a conflict of laws case;[70] as the *Boyes* court noted, it involved "a sale between a New Jersey seller and a Pennsylvania buyer of a boat which was constructed in North Carolina and docked after delivery in Delaware."[71] The plaintiffs, residents of Pennsylvania, brought suit in neighboring New Jersey. They alleged the falsity and/or failures to honor representations that had been made to them by the New Jersey seller partly in Pennsylvania (at the Philadelphia Boat Show),[72] and partly at the seller's principal place of business in New Jersey.[73]

The defendants—including the New Jersey boat dealer—questioned the applicability of New Jersey's Consumer Fraud Act, arguing that the Pennsylvania UTPCPL should be applied instead. (They made that argument, apparently, because in Pennsylvania, treble damages are discretionary with the court, while in New Jersey, they are mandatory.) Faced with the conflict of laws issue as to whether it should disregard the statutory law of its forum state, which it would normally look to, on the argued ground that the law of New Jersey, the forum state, was "in conflict with or repugnant to" Pennsylvania, law,[74] the *Boyes* court found no repugnance.[75]

---

Tennessee, and otherwise transacted business from his office in Tennessee).

**68.**   27 F.Supp.2d 543 (D.N.J.1998) (Irenas, J.).

**69.**   Dibbern Opp'n at 23.

**70.**   *See Boyes,* 27 F.Supp.2d at 546–48.

**71.**   *Id.* at 546.

**72.**   *Id.* at 545.

**73.**   *Id.*

**74.**   *Id.* at 548.

**75.**   *See id.*

It then went on to hold that where a Pennsylvania citizen had come into the state of New Jersey and had been allegedly defrauded—in material part as a consequence of what he had been told on his trip to New Jersey—it saw no reason why the New Jersey legislature would intend its statute to be inapplicable under such circumstances.[76]

> While there can be no doubt that the New Jersey legislature desired to protect its own residents, it is equally clear that this state has a powerful incentive to insure that local merchants deal fairly with citizens of other states and countries. Its magnificent seashore, to say nothing of casino gambling, bring millions of visitors annually to New Jersey making tourism a major industry. This industry would suffer if the state developed a reputation as a place w[h]ere sellers ripped off the unsuspecting visitor.

Thus *Boyes* is just another example of the cases that hold that a state's consumer protection law can protect nonresidents when they visit the state that enacted the law, and are defrauded on their visit.

Dibbern relies on language in *Boyes* that New Jersey "intended its Consumer Fraud statute to apply to sales made by New Jersey sellers even if the buyer is an out-of-state resident and some aspect of the transaction took place outside New Jersey."[77] But the context of those comments, quite obviously, was that "some aspect" took place outside of New Jersey, when the plaintiff had come into New Jersey to transact business in that state, and the cause of action arose in material part by reason of dealings between the two parties in *New Jersey*. It was not prem-

ised, in any way, solely on the fact that the defendant was a New Jersey resident. And it most assuredly was not an expression of views as to whether the New Jersey statute—much less the Pennsylvania one—would be construed to make it applicable to individuals around the country.

### 2. Argued Substantive Deficiencies

Adelphia further argues that aside from the matter of standing, Dibbern's complaint fails to state claims upon which relief can be granted under the subdivision of § 201–2 upon which he relies. The Court agrees with this point as well.

Dibbern alleges violations of three subdivisions of § 201–2(4): §§ 201–2(4)(v), (xv), and (xxi). The portions of § 201–2(4) upon which Dibbern relies provide:

> (4) **"Unfair methods of competition"** and **"unfair or deceptive acts or practices"** mean any one or more of the following:
>
> . . .
>
> (v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have;
>
> . . .
>
> (xv) Knowingly misrepresenting that services, replacements or repairs are needed if they are not needed;
>
> . . .
>
> (xxi) Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.[78]

---

76. *Id.* at 547.

77. *Id.* (quoting *Levin v. Lewis*, 179 N.J.Super. 193, 431 A.2d 157, 161 (1981)).

78. § 201–2(4) (bold in original).

Adelphia argues that in order to state claims for violations of each of those sections, the common law elements of fraud must be alleged, and that "nonfeasance" is not enough. Adelphia also argues that where, as here, the claim is based on a failure to speak as contrasted to affirmative representations, a duty to speak must be shown, and it cannot be founded upon the federal provisions upon which Dibbern relies.

The Court agrees.[79] Each of subsections (v) and (xv), by its express terms, requires, among other things, a representation. Pennsylvania's courts have held that to state a claim under subsection (v), "a plaintiff must establish that a defendant's representation is false, that it actually deceives or has a tendency to deceive and that the representation is likely to make a difference...."[80] Likewise, they have held that the catchall provision, sub-

section (xxi), also requires that the plaintiff plead the elements of common law fraud.[81]

Here Dibbern does not allege that anything that Adelphia said was false. He merely alleges that Adelphia did not tell him and other members of the class that converter boxes for which they were paying (which, so far as the record reflects and the allegations of the complaint go, functioned normally) had ceased to be necessary. That, without more, does not amount to a representation or misrepresentation.

Presumably to make up for that deficiency, Dibbern argues that there was a duty to speak, as a consequence of the federal statutory law and/or regulations quoted above. The Court cannot agree. The FCC regulation, 47 C.F.R. § 76.964(h), one of the argued sources for that duty,[82] does not currently exist, and

---

**79.** It also is not clear to this Court that, even taking Dibbern's allegations as true, it could be said that Adelphia represented that its services had "sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have," or that Adelphia represented that any person had "a sponsorship, approval, status, affiliation or connection" that he [did] not have. However, in light of the Court's other conclusions in this decision, the Court does not have to address this issue.

**80.** *Fay v. Erie Ins. Group,* 723 A.2d 712, 714 (Pa.Super.Ct.1999) (affirming dismissal of plaintiff's complaint because it failed to allege a misrepresentation by defendant); *see also Sexton v. PNC Bank,* 792 A.2d 602, 607 (Pa.Super.Ct.2002) (dismissing claims under, *inter alia,* subsections (v), (xv), and (xxi) alleging that when bank "collected a fee that was not authorized and for a 'service' that was not needed, it misrepresented the nature, character and need for the 'services' it was rendering," because the bank had no duty to notify the plaintiff of the fees).

**81.** *See Booze v. Allstate Ins. Co.,* 750 A.2d 877, 880 (Pa.Super.Ct.2000) (dismissing subsection (xxi) claims for failure to plead elements of common law fraud); *Hammer v. Nikol,* 659 A.2d 617, 619–20 (Pa.Commw.Ct.1995)

("Specifically, to recover under the catchall provision, the elements of common law fraud must be proven.").

**82.** Section 76.964 has since been repealed, but when it existed it provided:

> Written notification of changes in rates and services.
>
>   (a) In addition to the requirement of 76.309(c)(3)(i)(B) regarding advance notification to customers of any changes in rates, programming services or channel positions, cable systems shall give 30 days written notice to both subscribers and local franchising authorities before implementing any rate or service change. Such notice shall state the precise amount of any rate change and briefly explain in readily understandable fashion the cause of the rate change (e.g., inflation, changes in external costs or the addition/deletion of channels). When the change involves the addition or deletion of channels, each channel added or deleted must be separately identified. Notices to subscribers shall inform them of their right to file complaints about changes in cable programming service tier rates and services, shall state that the subscriber may file the complaint within 90 days of the effec-

did not exist during the relevant time period.[83] The two cited statutory provisions, 47 U.S.C. § 552(c)[84] and 47 U.S.C. § 544a,[85] while they were in existence during the period in question, do not impose such a duty. Indeed, neither imposes any obligation on cable system operators to provide any kind of notice to subscribers or to perform any other duty.[86]

## B.

### Breach of Contract

■ Dibbern's "Count II" alleges breach of contract. To state a claim for breach of contract under Massachusetts law,[87] a plaintiff must assert the existence

---

tive date of the rate change, and shall provide the address and phone number of the local franchising authority.

(b) To the extent the operator is required to provide notice of service and rate changes to subscribers, the operator may provide such notice using any reasonable written means at its sole discretion.

(c) Notwithstanding any other provision of Part 76, a cable operator shall not be required to provide prior notice of any rate change that is the result of a regulatory fee, franchise fee, or any other fee, tax, assessment, or charge of any kind imposed by any Federal agency, State, or franchising authority on the transaction between the operator and the subscriber.

83. Section 76.964 was enacted on June 21, 1993 and ceased effectiveness on October 5, 2000 (58 F.R. 29753 and 65 F.R. 531617).

84. It provides:

(c) Subscriber notice
A cable operator may provide notice of service and rate changes to subscribers using any reasonable written means at its sole discretion. Notwithstanding section 543(b)(6) of this title or any other provision of this chapter, a cable operator shall not be required to provide prior notice of any rate change that is the result of a regulatory fee, franchise fee, or any other fee, tax, assessment, or charge of any kind imposed by any Federal agency, State, or franchising authority on the transaction between the operator and the subscriber.

85. Section 544a is too lengthy to quote in full. It is sufficient, for purposes of this discussion, to note that along with classic administrative law provisions setting forth Congressional findings and standards for the exercise of the rulemaking authority there conferred, it issues directives to the FCC to report to Congress on means to provide compatibility between televisions and VCRs and cable systems, and to issue regulations to assure compatibility. It does not impose any obligations on cable system operators.

86. Adelphia further argues that even if there were such a duty, the determination of the question as to whether Adelphia failed to perform that duty would lie within the province of the local franchising agency in Massachusetts, or the FCC, rather than by private right of action. Though it is unnecessary to the Court's decision, in light of the conclusions set forth above, the Court agrees. *See In re Comcast Corp. Cable TV Rate Regulation*, 1994 WL 622105, at *4–5 (E.D.Pa. Nov.10, 1994) (subscriber had no private right of action for violations of the rate regulations).

87. Massachusetts law governs the contract claims. In its choice of law analysis, the Court first looks to the choice of law rules of New York, the forum state. *See, e.g., In re Lois/USA*, 264 B.R. at 90 (citing *Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) ("[W]hen this Court analyzes the conflicts of law with respect to claims arising under state law, it starts with the choice-of-law rules of New York, the forum state in which it sits.")).

New York applies the "significant contacts test" to choice of law issues other than tort law. "Under this more flexible approach, New York courts seek to apply the law of the jurisdiction with the most significant interest in, or relationship to, the dispute." *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1539 (2d Cir.1997) (citing *Babcock v. Jackson*, 12 N.Y.2d 473, 481–82, 191 N.E.2d 279, 283–84, 240 N.Y.S.2d 743, 749 (1963)).

Under this approach, courts may consider a spectrum of significant contacts, including the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties ... New

of a contract, a duty to perform under the contract, and a breach of that duty resulting in damages.[88] "While the rules do not mandate perfection it is essential to state with 'substantial certainty' the facts showing the existence of the contract and the legal effect thereof." [89]

■ Dibbern has not alleged the existence of contractual obligations of the type upon which he can base his claims, especially with the "substantial certainty" required by Massachusetts law. He states that "[o]ther than recent monthly billing statements, plaintiff no longer has contract documents . . . *if any existed,* concerning the installation or provision of cable services to his home by Adelphia. Any writing, *to the extent one exists,* can be obtained from Adelphias records." [90] Just as importantly, he does not allege any specific terms of the alleged contract—terms upon which the Court could find obligations that were undertaken that were not satisfied— nor that the parties .did indeed create a contract whose obligations then were breached.[91] Dibbern does not allege that whatever contract existed required Adelphia to notify him with respect to upgrades and their impact on his need to rent equip-ment. Allegations with these critical omissions are insufficient to plead a breach of contract.

Dibbern contends, however, that a contract can be implied in fact from the long course of dealing between the parties— which included, *inter alia,* billings to him and monthly payments by him.[92] But that does not respond to the real issue here. Of course the Court could find that a contractual relationship existed (and might still exist) between Dibbern and the Massachusetts Subsidiary. But that would not be the same as finding that any contract that did exist (or that continues to exist) would have the substantive terms that would support recovery.

■ Dibbern in substance makes a two-tier argument, alleging first that there was an implied in fact contract, and second, that "Adelphia" breached the implied covenant of good faith and fair dealing that every contract contains. But that is too much bootstrapping. The requirement of good faith performance is circumscribed by the obligations in the contract. "Thus, the covenant may not be invoked to create

York courts may also consider public policy "where the policies underlying conflicting laws in a contract dispute are readily identifiable and reflect strong governmental interests." . . . The traditional choice of law factors, the places of contracting and performance, are given the heaviest weight in this analysis. *Lazard Freres,* 108 F.3d at 1539 (quoting *In re Allstate Ins. Co. and Stolarz,* 81 N.Y.2d 219, 226, 613 N.E.2d 936, 939, 597 N.Y.S.2d 904, 907 (1993)). Here Dibbern is a resident of Massachusetts, the contract was made there, and he received, and Adelphia provided, performance there. Dibbern's local franchisor and franchisee are both located in Massachusetts, which is the state with the greatest interest in regulating the affairs of both.

**88.** *Doyle v. Hasbro, Inc.,* 103 F.3d 186, 194– 95 (1st Cir.1996) (citing *Singarella v. City of* Boston, 342 Mass. 385, 173 N.E.2d 290 (1961) and *Petricca v. Simpson,* 862 F.Supp. 13 (D.Mass.1994)).

**89.** *Winsmann v. Choate Health Mgmt., Inc.,* 1998 WL 282901, at *2 (Mass.Super.Ct. May 29, 1998) (citing *Doyle,* 103 F.3d at 194–95, quoting *Pollock v. New England Tel. & Tel. Co.,* 289 Mass. 255, 194 N.E. 133 (1935)).

**90.** Am. Compl. ¶ 80.

**91.** *See id.* ¶¶ 77–89.

**92.** *See* Dibbern Opp'n ¶ 78. "Finally, the billing statements themselves demonstrate that plaintiff contracted with Adelphia for the provision of cable service and provide terms for monthly billing cycles for cable service and the amounts due, including converter rental fees."

rights and duties not contemplated by the provisions of the contract or the contractual relationship." [93]

## C.

### Fraud

Dibbern's "Count III" alleges fraud. Once more, the Court applies Massachusetts law.[94] Under Massachusetts law, for a plaintiff to make a successful claim for fraud or misrepresentation, he or she "must show a false statement of a material fact made to induce the plaintiff to act, together with reliance on the false statement by the plaintiff to the plaintiffs detriment." [95]

The Court is not in a position to find that Dibberns allegations satisfy the Massachusetts fraud standard. He alleges that Adelphia made a fraudulent *omission*, not a *statement*, and an omission, in the absence of other statements which, by reason of the omission, become "half truths" or otherwise deceptive, does not equate to a misrepresentation sufficient to satisfy Massachusetts law.[96] In addition, the alle-

93. *Speakman v. Allmerica Fin. Life Ins. & Annuity Co.*, 2005 WL 958230, at *6 (D.Mass. Apr.21, 2005). *See also UNO Rests., Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 805 N.E.2d 957, 964 (2004) ("The covenant [of good faith] may not ... create rights and duties not otherwise provided for in the existing contractual relationship, as the purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance.").

94. The Court discussed the choice of law rules applicable to claims for fraud and other tort claims in its decision in *Lois/USA*, and will not repeat that discussion in comparable length here. Applying "interest analysis" doctrine and considering the significant contacts, in which jurisdiction they are located, and then whether the purpose of the law is to regulate conduct or to regulate loss, the Court finds the "significant contacts" to be the Massachusetts locus of Dibbern, the Massachusetts locus of the Massachusetts Subsidiary, the Pennsylvania locus of the Adelphia parent (which is alleged to have directed the affairs of the Massachusetts Subsidiary), and the Massachusetts locus of the tort, where Dibbern suffered his alleged injury—with Dibbern's alleged mailing of payments from Massachusetts to Pennsylvania insufficiently material to be a factor in the analysis. Those factors tilt in favor of application of Massachusetts law.

Then, as in *Lois/USA, see* 264 B.R. at 108, the Court finds that "it is plain that we are faced with conduct-regulating rules of law—scrutinizing the conduct of the parties, and determining what is, or is not, actionable con-

duct." Thus the Court looks to the law of the place of the tort. "[A] cause of action for fraud arises where the loss is sustained and that loss from fraud is deemed to be suffered where its economic impact is felt, normally, the plaintiff's residence." *Sack v. V.T. Low*, 478 F.2d 360, 366 (2d Cir.1973) ("[W]hen a person sustains loss by fraud, the place of wrong is where the loss is sustained, not where fraudulent representations are made."). That likewise dictates a choice of Massachusetts law. Hence the Court applies Massachusetts law as to the tort claims as well.

95. *Ravosa v. Zais*, 40 Mass.App.Ct. 47, 661 N.E.2d 111, 116 (1996) (citing *Zimmerman v. Kent*, 31 Mass.App.Ct. 72, 575 N.E.2d 70 (1991); *Hogan v. Riemer*, 35 Mass.App.Ct. 360, 619 N.E.2d 984 (1993); and *VMark Software, Inc. v. EMC Corp.*, 37 Mass.App.Ct. 610, 642 N.E.2d 587 (1994)). *See also Mass Cash Register, Inc. v. Comtrex Sys. Corp.*, 901 F.Supp. 404, 424 (D.Mass.1995).

96. Dibbern cites *Spencer Cos., Inc. v. Chase Manhattan Bank, N.A.*, 81 B.R. 194, 202 (D.Mass.1987) for the proposition that "[s]ometimes silence can constitute a misrepresentation where the defendant fails to disclose information that he is bound to reveal to the plaintiff." *See* Dibbern Opp'n ¶ 74. *Spencer*, in turn, cites *Maxwell v. Ratcliffe*, 356 Mass. 560, 254 N.E.2d 250 (1969) in support. But *Maxwell* does not support the proposition that silence can constitute a misrepresentation. In *Maxwell*, real estate agents affirmatively stated that a cellar was dry, when the agents knew or should have

gation that Adelphia provided *inadequate* statements of notice does not satisfy the fraud standard either. The statements made in the May 2001 and September 2001 bills were not misrepresentative or misleading, as required for a finding of fraud in Massachusetts. In fact, each notice in the billing statements clearly and accurately stated that BST-only subscribers no longer needed to rent cable boxes.

## D.

### Unjust Enrichment

Dibbern's "Count IV" asserts claims based on unjust enrichment. In general, "[a] person who has been unjustly enriched at the expense of another is required to make restitution where the circumstances of the receipt or retention of the benefit conferred are such that as between the two persons, it is unjust for one to retain it." [97]

A plaintiff must prove three elements to make a successful unjust enrichment claim in Massachusetts: (1) that plaintiff conferred a benefit on the defendant; (2) that defendant knew that he or she received the benefit; and (3) that defendant accepted or retained the benefit under such circumstances as to make it

inequitable for the defendant not to pay a value for it. [98]

Dibbern's unjust enrichment claim is in substance that Adelphia "fraudulently and wrongfully obtained money from the plaintiff by using its superior knowledge and offensive billing practices...." [99] He then argues that because Adelphia knowingly and fraudulently obtained money from the plaintiff, retention of those funds constitutes unjust enrichment. [100]

In substance, then, Dibbern's claim for unjust enrichment is a reiteration of his fraud claim, with no additional allegations that would support a claim for unjust enrichment. It suffers from the same deficiencies that the fraud claim did.

## E.

### Accounting

Dibbern's "Count V" seeks an accounting. He contends that "[i]n order for the plaintiff to obtain and for the court to award appropriate relief, a full and accurate description of the amount and use of funds is required...." [101] The request seeks detailed financial information regarding funds paid to Adelphia by the plaintiff, and "all funds drawn from Adelp-

---

known that there was water seepage periodically in the cellar. *Id.* at 252. "Because the question of the dryness of the cellar had been raised expressly, there was special obligation on the brokers to avoid half truths and to make disclosure at least of any facts known to them...." *Id.* There are no similar half-truth allegations here.

**97.** *Corcoran Mgmt. Co., Inc. v. Town of Framingham*, 2003 WL 21960676, at *8 (Mass.Super.Ct. July 3, 2003) (citing *Keller v. O'Brien*, 425 Mass. 774, 683 N.E.2d 1026, 1029–30 (1997) and *Salamon v. Terra*, 394 Mass. 857, 477 N.E.2d 1029, 1031 (1985)).

**98.** *Dickens–Berry v. Greenery Rehab. and Skilled Nursing Ctr.*, 1993 WL 818564, at *3 n.

6 (Mass.Super.Ct. Oct. 29, 1993) (quoting 12 *Williston on Contracts* § 1479 (3d ed.1957)).

The Court considers Massachusetts law to be applicable, for the reasons set forth above with respect to the contract claims, but notes that the Pennsylvania law as to this is substantially the same. *See also Koch v. First Union Corp.*, 2002 WL 372939, at *8 (Pa.Com. Pl. Jan.10, 2002); *Official Comm. of Unsecured Creditors v. Forman (In re Forman Enters.)*, 281 B.R. 600, 608 (Bankr.W.D.Pa. 2002).

**99.** Dibbern Opp'n ¶ 81.

**100.** *Id.*

**101.** Am. Compl. ¶ 110.

hias accounts and used by or on behalf of any defendant or non-party, including Adelphias Management...." [102]

■■■■■ The Court does not have to consider Adelphias contention that an accounting is a remedy and not a claim, and can be awarded only in aid of another viable cause of action, as the Court does not believe that a viable claim for an accounting has been asserted in any event. Once more, the Court believes that Massachusetts law is applicable, and Massachusetts caselaw holds that " '[i]n order to maintain a bill in equity for an accounting, it must appear from the specific allegations that there was a fiduciary relation between the parties or that the account is so complicated that it cannot conveniently be taken in an action of law.' " [103]

■■■ Applying those principles to the allegations of the Amended Complaint, even after taking all of Dibberns allegations as true, a claim for an accounting has not been satisfactorily alleged. Under the facts as alleged here, no fiduciary relationship exists between Dibbern as cable cus-

tomer and the Massachusetts Subsidiary (or "Adelphia") as cable provider. In Massachusetts [104] (as in Pennsylvania, for that matter),[105] "business transactions conducted at arms length generally do not give rise to fiduciary relationships...." And while there is an exception to that rule where one party reposes its confidence in another,[106] "the plaintiff alone, by reposing trust and confidence in the defendant, cannot thereby transform a business relationship into one which is fiduciary in nature." [107] While the existence or nonexistence of a fiduciary duty has been held to present a question of fact,[108] here Dibbern has not alleged facts of a character to take this case out of the general rule, especially in light of the Massachusetts Supreme Courts holding that the plaintiff alone cannot transform a business relationship into one that is a fiduciary in nature.[109] The relationship between cable customer and cable provider is no different than the multitude of other relationships between buyers and sellers of services. Dibbern's allegation that Adelphia knew more about its cable system and its capabilities than

---

**102.** *Id.* ¶ 111.

**103.** *Connolly v. Spracklin,* 1994 WL 879710, at *4 (Mass.Super.Ct. July 12, 1994) (citing *Ball v. Harrison,* 314 Mass. 390, 50 N.E.2d 31, 32 (1943)); *see also Integrated Techs. Ltd. v. BioChem Immunosystems, (U.S.) Inc.,* 2 F.Supp.2d 97, 100–01 (D.Mass.1998).

**104.** *Indus. Gen. Corp. v. Sequoia Pacific Sys. Corp.,* 44 F.3d 40, 44 (1st Cir.1995); *accord Savoy v. White,* 139 F.R.D. 265, 267 (D.Mass. 1991) (same); *Wilson Farm, Inc. v. Berkshire Life Ins. Co.,* 2002 WL 31440151, at *8 (Mass.Super.Ct. Oct. 31, 2002) (same). *See also Ries v. Rome,* 337 Mass. 376, 149 N.E.2d 366, 370 (1958) (facts did not justify finding of fiduciary relationship; "We think that the relationship between him and the plaintiffs was no more than a business relationship.... Compare cases where there was a recognized type of confidential relationship, fiduciary in character.").

**105.** *See Ginley v. E.B. Mahoney Builders, Inc.,* 2005 WL 27534, at *1 (E.D.Pa. Jan.5, 2005) (A fiduciary duty "will not be automatically inferred from the existence of an arm's-length business contract.... This Court has held that there is a crucial distinction between surrendering control of one's affairs to a fiduciary in a position to exercise undue influence and entering into an arm's-length commercial agreement, however important its performance may be.").

**106.** *See, e.g., Indus. Gen.,* 44 F.3d at 44.

**107.** *Superior Glass Co., Inc. v. First Bristol County Nat'l Bank,* 380 Mass. 829, 406 N.E.2d 672, 674 (1980); *accord Indus. Gen.,* 44 F.3d at 44 (quoting *Superior Glass*).

**108.** *See Indus. Gen.,* 44 F.3d at 44.

**109.** *See supra* note 107.

Dibbern did does not create a fiduciary relationship where one would otherwise not exist.

Similarly, Massachusetts law also allows an accounting if the financial accounts are very complicated—but transactions between the plaintiff and Adelphia certainly could not qualify as such. Adelphia issued bills (many of which Dibbern seems to have in his possession), and Dibbern paid those bills. It would be easy enough to trace those transactions if it ever appeared to be necessary. Dibbern is suing his contract counter-party in an action for damages, in an action where the extent of his alleged loss can easily be measured, and the factors noted above all require dismissal of the claim for an accounting.

### F.

### Constructive Trust

■ Finally, Dibbern's "Count VI" seeks the imposition of a constructive trust. He bases his request on the contention that the money transferred for unnecessary cable box rental fees was induced by fraud and was obtained in breach of an alleged fiduciary relationship between Dibbern and Adelphia. He then contends that Adelphia would be unjustly enriched if it were to retain the property.[110]

■ Here too, however, Dibbern's claim is legally deficient. Under Massachusetts law:

> A constructive trust is a device employed in equity, in the absence of any intention of the parties to create a trust,

"in order to avoid the unjust enrichment of one party at the expense of the other where the legal title to the property was obtained by fraud or in violation of a fiduciary relation or where information confidentially given or acquired was used to the advantage of the recipient at the expense of the one who disclosed the information."[111]

As noted above, Dibbern has failed to state claims for relief for fraud or unjust enrichment. The "fiduciary relationship" predicate for imposition of a constructive trust is, as noted above,[112] similarly lacking. As observed above, the relationship between cable customer and cable provider is no different than the multitude of other relationships between buyers and sellers of services. Nor is there a satisfactory allegation that information was confidentially given or acquired, which was used to the advantage of the recipient at the expense of the one who disclosed the information.

Moreover, while the Second Circuit has "rejected the notion that bankruptcy law trumps state constructive trust law,"[113] the Circuit has further recognized that the obligation to consider the application of constructive trust law "does not diminish the need to 'act very cautiously' to minimize conflict with the goals of the Bankruptcy Code."[114] In that connection, the Second Circuit cautioned in *First Central Financial* that the Bankruptcy Code's goals can be compromised by the imposition of a constructive trust, and observed, as a consequence, that "bankruptcy courts are generally reluctant to impose construc-

---

110. *See* Dibbern Opp'n ¶¶ 29–48.

111. *North East Technical Sales, Inc. v. Barshad*, 2000 WL 1252184, at *5 (Mass.Super.Ct. Aug. 14, 2000) (quoting *Barry v. Covich*, 332 Mass. 338, 124 N.E.2d 921, 924 (1955)).

112. *See supra* notes 104–108.

113. *Superintendent of Ins. v. Ochs (In re First Central Fin. Corp.)*, 377 F.3d 209, 217 (2d Cir.2004) (*"First Central Financial"*).

114. *Id.* (quoting *Torres v. Eastlick (In re North American Coin & Currency, Ltd.)*, 767 F.2d 1573, 1575 (9th Cir.1985)).

tive trusts without a substantial reason to do so." [115]   The *First Central Financial* court cited and quoted from four separate decisions from lower courts in the Second Circuit recognizing the extent to which the imposition of constructive trusts against assets that would otherwise be estate property is an anathema to the equitable nature of cases under the Bankruptcy Code.[116]

The Second Circuit thus noted in *First Central Financial* that:

> Although we do not disturb the general rule that constructive trusts must be determined under state law, we believe it important to carefully note the difference between constructive trust claims arising in bankruptcy as opposed to those that do not, as the "equities of bankruptcy are not the equities of the common law." [117]

Although this case is not a chapter 7 case, as *First Central Financial* was, it shares a common characteristic—that the imposi-

tion of a constructive trust would take "from competing creditors, and not from the offending debtor," [118] and would "work an injustice on all the creditors not a party to this proceeding." [119]   This reality reinforces the Court's conclusion, consistent with the Second Circuit's conclusion in *First Central Financial,* that the facts as pleaded do not show that Adelphia holds property "under such circumstances that in equity and good conscience, [it] ought not to retain it." [120]

## Conclusion

The motion to dismiss this adversary proceeding is granted, and this adversary proceeding is thus dismissed.   Dibberns separate proof of claim, on an individual and class action basis, shall be disallowed unless he objects thereto within 20 days of the date of this decision.   In the event of any such objection, the parties shall agree upon a briefing schedule to address the extent to which this decision is or is not *res*

**115.** *Id.* at 217–18 (quoting *Haber Oil Co., Inc. v. Swinehart (In re Haber Oil Co., Inc.),* 12 F.3d 426, 436 (5th Cir.1994)).

**116.** *Id.* at 218 (citing *Schmitt v. Lumbard (In re Universal Money Order Co.),* 470 F.Supp. 869, 879 (S.D.N.Y.1977) (Haight, J.) (declining to impose a constructive trust after observing that "[t]he destructive effect of [a constructive trust], within the context of a uniform national bankruptcy law, is apparent."); *Allen–Bradley Co., Inc. v. Commodore Bus. Machines, Inc. (In re Commodore Bus. Machines, Inc.),* 180 B.R. 72, 83 (Bankr. S.D.N.Y.1995) (Garrity, J.) ("[C]onstructive trusts are anathema to the equities of bankruptcy since they take from the estate, and thus from competing creditors, and not from the offending debtor.") (internal quotation marks and citation omitted); *In re Braniff Int'l Airlines, Inc.,* 164 B.R. 820, 827 (Bankr. E.D.N.Y.1994) (Cyganowski, J.) (stating that the policy underlying the bankruptcy laws "runs counter to that underlying the imposition of a constructive trust" and declining to impose a constructive trust);   and *Lane*

*Bryant, Inc. v. Vichele Tops, Inc. (In re Vichele Tops, Inc.),* 62 B.R. 788, 792 (Bankr. E.D.N.Y.1986) (Holland, J.) ("[T]his court would be reluctant to recognize the [constructive] trust because such action would work an injustice on all the creditors not a party to this proceeding.   The general creditor body should not be prejudiced....")).

*Cf. LFD Operating, Inc. v. Ames Dep't Stores, Inc. (In re Ames Dep't Stores, Inc.),* 274 B.R. 600 (Bankr.S.D.N.Y.2002) (Gonzalez, J.) (denying effort to impose a constructive trust where neither express trust, nor other claim for anything other than breach of contract, was established), *aff'd,* 2004 WL 1948754 (S.D.N.Y. Sept.1, 2004) (Stein, J.).

**117.** *First Central Financial,* 377 F.3d at 218.

**118.** *Commodore,* 180 B.R. at 83.

**119.** *Vichele Tops,* 62 B.R. at 792.

**120.** *First Central Financial,* 377 F.3d at 218 (quoting *Miller v. Schloss,* 218 N.Y. 400, 407, 113 N.E. 337, 339 (1916)).

*judicata,* or otherwise dispositive, with respect to Dibberns claim.

SO ORDERED.